631 A.2d 946

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
MOISES AFANADOR, DEFENDANT–APPELLANT.

Argued March 16, 1993—Decided October 27, 1993.

*Lawrence S. Lustberg* argued the cause for appellant (*Crummy, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Lustberg* and *J. Timothy Mc Donald,* on the brief).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

*Moises Afanador* submitted a brief *pro se.*

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant, Moises Afanador, challenges the Appellate Division's affirmance of his conviction for violation of *N.J.S.A.* 2C:35–3, the so-called "drug kingpin" statute. As required by the sentencing provision of that statute, the trial court sentenced defendant to life imprisonment with a twenty-five-year period of parole ineligibility. This Court granted certification, 130 *N.J.* 601, 617 *A.*2d 1222 (1992), limited to consideration of defendant's contentions that *N.J.S.A.* 2C:35–3 is (1) unconstitutionally vague on its face, or (2) vague as applied to defendant's conduct. In a well-reasoned opinion the Appellate Division rejected those challenges. We affirm.

I

We note preliminarily a significant feature of defendant's arguments. In resolving whether *N.J.S.A.* 2C:35–3 is facially vague, we need not refer to the facts—we need only read the statute. However, for purposes of defendant's contention that the statute is vague as applied to his conduct, we accept as true the State's evidence concerning defendant's actions, viewing that evidence in the light most beneficial to the State's position. Although the defense witnesses' testimony, especially that of defendant himself, contrasted sharply with that of the State's witnesses, in deciding an as-applied challenge a court presumes that a jury accepted the State's evidence. The only question relevant in respect of a vague-as-applied challenge is whether the statute clearly extends to the acts that the State alleges defendant committed. We therefore summarize the State's evidence at trial.

We focus on defendant's participation in four drug transactions with Detective Ruiz, an undercover officer in the Pleasantville Police Department. In the first transaction, on September 18, 1987, Ruiz, accompanied by an informant who knew defendant,

arrived at Afanador's home. Claiming to be a drug dealer, Ruiz asked defendant to sell him a half-ounce of cocaine. Afanador dispatched a young woman present at his home to find a scale, whereupon Ruiz engaged defendant in a conversation in the course of which he said that he and some other persons wished to go into the drug business. In answer, Afanador warned Ruiz that "the business was risky" and that defendant had approximately $2,300 "on the street" that people owed him as a result of defendant's "business." While the conversation was taking place, Ruiz noticed significant "traffic in and out of the house." (Another officer had conducted a surveillance of defendant's home for three-and-one-half hours on the previous day; at trial that officer testified that during the surveillance at least eleven cars had pulled into defendant's driveway only to depart in under fifteen minutes.) At one point during his discussion with Ruiz, defendant directed his nephew, who was introduced to Ruiz as "Popo," to divert a black car that was attempting to pull into the driveway. Ruiz testified that Popo was often present on other occasions when the officer had dealt with defendant, and that defendant had at times given Popo instructions.

When a scale could not be found, defendant removed from his pants pocket a plastic bag containing one ounce of cocaine. After telling Ruiz that he could determine a half-ounce by sight, Afanador separated the cocaine into two approximately-equal piles and gave the cocaine to the officer in exchange for $700 in cash.

The second transaction took place on September 23, 1987. At 6:00 p.m. Ruiz again arrived at defendant's home and asked to purchase one ounce of cocaine. Defendant told Ruiz that he would sell him an ounce for $1,200 and that the officer should return between 8:00 and 8:30 p.m. When Ruiz returned at 8:15, Afanador's wife directed the officer to the back door of the house. Defendant appeared and led Ruiz into a basement where he removed from an empty light-bulb box a bag containing an ounce of cocaine, which he gave to Ruiz in return for $1,200 in cash. Defendant then freebased cocaine in the officer's presence. During a conversation with Ruiz at that time, Afanador claimed that

he had been in the drug business for twenty years. Ruiz inquired about the price for four-and-one-half ounces of cocaine. Defendant quoted a price of $3,700 and told Ruiz that he would need six hours advance notice to secure that amount of cocaine.

The third transaction began with Ruiz's return to defendant's home on the morning of October 2nd. Popo and a person named "Cholo"—from whom the officer had made undercover buys in the past—were also present. Defendant and Ruiz thereafter stepped outside the house, where Ruiz told defendant that he wanted to buy two ounces of cocaine. When the officer asked Afanador "if there was any problem with that," defendant said "No."

Defendant then drove with Ruiz to the Florence Park Apartments, where they met Johnny Montalvo, who is also known as "Johnny Afanador." Defendant asked Montalvo if Montalvo "was ready," and after receiving an affirmative response told Montalvo to meet him at "the black girl's house," but quickly changed his mind and told Montalvo to meet him at defendant's house. Defendant and Ruiz next drove to the Walnut Manor Apartments, where a black male approached defendant's car and asked defendant "at what time he was going to come around with the stuff." Later another male, whom Ruiz recognized as Pedro Ortiz (from whom the officer had made undercover buys in the past), approached the car, and defendant told Ortiz that "it was in." Ortiz asked if it was "okay if he would go over to the defendant's house later."

Ruiz and defendant returned to defendant's home, and Montalvo arrived a short time later. In Afanador's living room Montalvo handed two ounces of cocaine to defendant, who promptly handed it to Ruiz. Defendant directed Ruiz to give the $1,200 to Montalvo and told Montalvo to count it. Montalvo kept that money, and defendant gave Montalvo an additional $100 in twenty-dollar bills.

Ruiz then made overtures leading to the fourth transaction. He told Afanador that he and some other persons were interested in purchasing $25,000 worth of cocaine. Defendant asked Ruiz when he would need the drugs and inquired of Montalvo if he "would be able to go up there" by that date. At that time defendant again spoke of people owing him money because of his business, this

time claiming that "he had $27,000 in the street that people owed him."

When Ruiz met with defendant again on October 21st, defendant told him that "the package * * * would be coming down from New York" on the 22nd and that defendant's "uncle," Osualdo Acobes, was acting as the courier. At some point Ruiz had reduced the amount of his request from $25,000 to $10,000 worth of cocaine. Defendant instructed Ruiz to have $10,000 in cash the following day.

Acobes arrived at Afanador's home at 5:00 p.m. on October 22nd. After defendant located a scale and placed it in the trunk of Acobes' car, he, Acobes, and Ruiz proceeded to the Florence Park Apartments. They entered one of the apartments and met a person introduced to Ruiz as "Nando." Acobes placed a scale and a brown, square package on the dining-room table. Defendant stood observing that activity. Acobes requested the money from the officer, but Ruiz, who had instructions from his superiors to consummate the transaction at defendant's home, argued that he had left the $10,000 at Afanador's home and insisted that the parties complete the transaction there. Nando accompanied Ruiz to defendant's home. Once there, Nando and Ruiz agreed that Nando would count the money, that the two of them would return to the Florence Park Apartments at which time Nando would verify that defendant had the correct amount of money, and that the package would thereafter be delivered to Ruiz at defendant's home.

When defendant, Nando, Acobes, and Ruiz later returned to defendant's home as agreed, Ruiz gave his fellow officers a prearranged signal and they moved in to arrest. A search of the trunk of Acobes' car revealed a brown paper bag containing 535 grams of cocaine. Laboratory tests fixed the cocaine's purity at eighty-four percent.

## II

A jury convicted defendant of violating the "drug kingpin" statute, *N.J.S.A.* 2C:35-3, which provides in pertinent part:

A person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State methamphetamine, lysergic acid diethylamide, phencyclidine or any controlled dangerous substance classified in Schedule I or II, or any controlled substance analog thereof. Leader of narcotics trafficking network is a crime of the first degree and upon conviction thereof * * * a person shall be sentenced to an ordinary term of life imprisonment during which the person must serve 25 years before being eligible for parole. * * *.

Notwithstanding the provisions of *N.J.S.* 2C:1–8 a conviction of leader of narcotics trafficking network shall not merge with the conviction for any offense [that] is the object of the conspiracy. * * *.

It shall not be necessary in any prosecution under this section for the State to prove that any intended profit was actually realized. The trier of fact may infer that a particular scheme or course of conduct was undertaken for profit from all of the attendant circumstances, including but not limited to the number of persons involved in the scheme or course of conduct, the actor's net worth and his expenditures in relation to his legitimate sources of income, the amount or purity of the specified controlled dangerous substance or controlled dangerous substance analog involved, or the amount of cash or currency involved.

The statute was enacted as part of the "Comprehensive Drug Reform Act of 1986," *L.* 1987, *c.* 106; *N.J.S.A.* 2C:35–1 to –23. The introduction to that Act noted that

to be effective, the battle against drug abuse and drug-related crime must be waged aggressively at every level along the drug distribution chain, but in particular, our criminal laws must target for expedited prosecution and enhanced punishment those repeat drug offenders and upper echelon members of organized narcotics trafficking networks who pose the greatest danger to society. * * * [T]o ensure the most efficient and effective dedication of limited investigative, prosecutorial, judicial and correctional resources, it is the policy of this State to distinguish between drug offenders based on the seriousness of the offense, considering principally the nature, quantity and purity of the controlled substance involved, and the role of the actor in the overall drug distribution network. It is the intention of the Legislature to provide for the strict punishment, deterrence and incapacitation of the most culpable and dangerous drug offenders * * *.

[*N.J.S.A.* 2C:35–1.1c.]

Although the statute is hardly a model of precise draftsmanship, we nevertheless are satisfied that it sufficiently describes the conduct that it proscribes. We therefore hold that it is not unconstitutionally vague, either facially or as applied to defendant's conduct.

–A–

In *Town Tobacconist v. Kimmelman*, 94 *N.J.* 85, 462 *A.2d* 573 (1983), the Court observed that

[c]lear and comprehensible legislation is a fundamental prerequisite of due process of law, especially where criminal responsibility is involved. Vague laws are unconstitutional even if they fail to touch constitutionally protected conduct, because unclear or incomprehensible legislation places both citizens and law enforcement officials in an untenable position. Vague laws deprive citizens of adequate notice of proscribed conduct, and fail to provide officials with guidelines sufficient to prevent arbitrary and erratic enforcement.

[*Id.* at 118, 462 *A.2d* 573 (citations omitted).]

For that reason, courts give criminal laws sharper scrutiny and more exacting and critical assessment under the vagueness doctrine than they give to civil enactments. *State v. Cameron*, 100 *N.J.* 586, 592, 498 *A.2d* 1217 (1985) (citing *State v. Lee*, 96 *N.J.* 156, 167, 475 *A.2d* 31 (1984); *Town Tobacconist, supra*, 94 *N.J.* at 119 n. 16, 462 *A.2d* 573).

A criminal statute violates due process if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Constr. Co.*, 269 *U.S.* 385, 391, 46 *S.Ct.* 126, 127, 70 *L.Ed.* 322, 328 (1926). As the United States Supreme Court has noted, "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depend in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 *U.S.* 489, 498, 102 *S.Ct.* 1186, 1193, 71 *L.Ed.*2d 362, 371, *reh'g denied*, 456 *U.S.* 950, 102 *S.Ct.* 2023, 72 *L.Ed.*2d 476, *on remand*, 688 *F.*2d 842 (7th Cir.1982). We appreciate full well the severe nature of the penalty for violation of *N.J.S.A.* 2C:35–3—life, with a twenty-five-year parole disqualifier—and have given the gravity of that sanction due consideration in reviewing defendant's appeal.

"Facial invalidity" occurs when a statute "is 'impermissibly vague in all its applications,' that is, there is no conduct that it proscribes with sufficient clarity." *Cameron, supra*, 100 *N.J.* at 593, 498 *A.2d* 1217 (quoting *Hoffman Estates, supra*, 455 *U.S.* at

495, 102 *S.Ct.* at 1192, 71 *L.Ed.*2d at 369). Defendant focuses first on the kingpin statute's requirement that a defendant conspire as "organizer, supervisor, financier or manager" of the drug-trafficking network. Similar challenges, both unsuccessful, have been mounted to the federal kingpin statute, 21 *U.S.C.A.* § 848, and the Maryland kingpin statute. See *United States v. Valenzuela,* 596 *F.*2d 1361 (rejecting vagueness challenge concerning phrase "organizer, a supervisory position, or any other position of management" in 21 *U.S.C.A.* § 848, and noting that "the words encompassed within the phrases * * * enjoy a wide currency in the business community and are commonly understood by members of the public," *id.* at 1368), *cert. denied,* 444 *U.S.* 865, 100 *S.Ct.* 136, 62 *L.Ed.*2d 88 (1979); and *Williams v. State,* 329 *Md.* 1, 616 *A.*2d 1275 (1992) (holding that terms "organizer, supervisor, financier or manager" used in Maryland statute were "accessible to persons of common intelligence," *id.* 616 *A.*2d at 1280).

We agree with the *Valenzuela* and *Williams* courts that a person of average intelligence comprehends the meaning of the words "organizer, supervisor, financier or manager." The utterance of any of those expressions certainly would not send the average citizen scrambling for a dictionary. Absent any explicit indications of special meanings, the words used in a statute carry their ordinary and well-understood meanings. *Mortimer v. Board of Review,* 99 *N.J.* 393, 398, 493 *A.*2d 1 (1985) (citing *Levin v. Township of Parsippany–Troy Hills,* 82 *N.J.* 174, 182, 411 *A.*2d 704 (1980); *Abbotts Dairies v. Armstrong,* 14 *N.J.* 319, 325, 102 *A.*2d 372 (1954)). The Legislature has given no indication that it intended the quoted words of the kingpin statute to have special meanings. Therefore, we accord those words their common definitions and conclude that those terms are not facially vague.

We pause to give special attention to the word "organizer" because defendant's appeal in the Appellate Division focused on that term. Defendant argues that "organizer" is susceptible of a number of meanings, including definitions that might extend the reach of the kingpin statute far beyond the legislation's intended

purpose, thereby rendering the statute unconstitutionally vague. Defendant believes that the inclusion of the word "organizer" among the elements of the crime permits the application of the kingpin statute to middlemen whose sole involvement in drug transactions consists of bringing a willing buyer and seller together. That result, defendant argues, conflicts with the Drug Reform Act's aim to target for more severe punishment "upper-echelon members" of drug-trafficking networks. Defendant believes that such a middleman "organizes" a drug deal by acting as a conduit from the supplier to the buyer. One commentator who has read the statute in a similar fashion has suggested that the statute could apply to every street-level transaction involving a seller who receives drugs from a supplier and sells those drugs to the ultimate consumer. See Cannel, *New Jersey Criminal Code Annotated*, comment on *N.J.S.A.* 2C:35-3 (1992–93).

■ We do not agree. The clear implication of "organizer," particularly in a statute dealing with a "leader" of a drug-trafficking network, is that the term describes a person who exercises some supervisory power over others. That becomes even clearer when the expression appears in the same context as the words "supervisor, financier or manager," for those words also connote some degree of control over another person's actions. The meaning ascribed to the words used in a statute may be indicated or controlled by the words with which it is associated. *Germann v. Matriss*, 55 *N.J.* 193, 220, 260 *A.*2d 825 (1970). Here, the inclusion of the word "organizer" among other terms denoting authority to direct the acts of another obviously indicates that it carries a similar connotation, namely, the primary meaning of "organizer" in common usage.

Although as defendant points out, legal secretaries performing their duties and administrative functions might be said to "organize" a law office, an outside observer would probably not consider a secretary an "organizer of the firm." More likely, the outsider would name one of the titular partners as the firm's "organizer." The word "organizer," particularly when used in conjunction with

the terms "supervisor, financier or manager," unambiguously indicates that a defendant violates the statute only if the defendant exercises some ability to dictate the conduct of others in a drug-trafficking scheme. Therefore the statute does not suffer from facial vagueness.

Nor do we agree with defendant's contention that the statute could encompass all street-level dealers who do not grow their own products. The statute requires that a defendant "conspire with *others as organizer.*" (Emphasis added.) We note first that *N.J.S.A.* 2C:35-3 refers to *others* as opposed to *another or others,* but *N.J.S.A.* 2C:5-2(a), New Jersey's conspiracy statute, requires that a defendant conspire with "another or others." Therefore, the Legislature obviously intended that the drug-trafficking conspiracy involve at least three persons: the kingpin defendant and two others.

The casual purchaser will not ordinarily constitute one of the "others" with whom a defendant conspires, because in most cases a street distributor does not direct or supervise a drug buyer. Although a dealer may inform a buyer how to complete the transaction, he or she has no authority over the buyer. Therefore, to violate the kingpin statute a defendant must direct the actions of at least two other persons other than the person to whom the defendant sells the drugs. Because street-level dealers ordinarily lack any supervisory power over their suppliers or buyers, the statute does not transform every dealer into a kingpin.

If, however, a defendant sells a quantity of drugs to a person who intends to resell those drugs and the defendant has some supervisory power over the reseller, that reseller is one of the "others" with whom the defendant has conspired. That result comports with the Legislature's expressed intention to target "upper-echelon" members of a drug-trafficking network, because in that instance the defendant has conspired with the reseller as an organizer, supervisor, manager, or financier.

New Jersey's requirement of two additional conspirators contrasts with the federal kingpin statute, which requires that a

defendant direct at least five persons. The Legislature was doubtless aware of the federal enactment's five-person requirement but chose to impose a co-conspirator minimum of only two. We presume that choice was intentional and was the product of a policy judgment by the Legislature. We have no reason to question the Legislature's decision to set a standard less stringent than is found in the federal statute.

Moreover, the New Jersey kingpin statute does direct that a trier of fact may consider the number of persons involved in the scheme in determining whether a defendant was engaged for profit in drug trafficking; therefore, consideration of the size of a drug operation, although not mandated, may influence a, factfinder's determination that a defendant did or did not act as a leader of a narcotics-trafficking network.

We note further that New Jersey chose not to incorporate the federal requirement of three prior convictions before a defendant reaches kingpin status. The Legislature explicitly rejected the necessity that the State prove a "pattern" of illegal behavior, although such proof is necessary under the federal statute and under *N.J.S.A.* 2C:5–2(g), which imposes criminal liability for acting as a "leader of organized crime." See *Official Commentary to the Comprehensive Drug Reform Act (L.1987, c. 106), reprinted in* 9 *Crim.Just.Q.*, 149, 152 (1987).

In the State's continuing battle against drugs—and particularly in the Drug Reform Act of 1986—New Jersey has mandated strict penalties for serious drug offenses. See, *e.g., N.J.S.A.* 2C:35–4 (providing that maintenance of controlled-dangerous-substance-production facility is crime of first degree and imposing minimum term of imprisonment); *N.J.S.A.* 2C:35–5(b)(1) (providing that manufacturing, distributing, or dispensing heroin or cocaine or their derivatives constitutes first-degree offense and imposing minimum term of imprisonment); *N.J.S.A.* 2C:35–6 (providing that employing juvenile in drug-distribution scheme is crime of second degree and imposing minimum term of imprisonment); *N.J.S.A.* 2C:35–7 (providing that distributing controlled dangerous

substance within 1,000 feet of school property is third-degree crime and imposing minimum term of imprisonment); *N.J.S.A.* 2C:35–8 (providing that distribution of controlled dangerous substance to person under age of eighteen doubles term of imprisonment, period of parole eligibility, and fines otherwise imposed under *N.J.S.A.* 2C:35–5). New Jersey's decision not to include the five-conspirator requirement or the previous-conviction requirement of the federal statute makes the kingpin statute broad; it does not, however, make the statute vague.

Although undoubtedly severe, the statute is not unconstitutionally vague on its face: it describes the elements of the offense in common, well-understood terms and therefore affords notice of the potential criminal liability for its violation. The harshness of the penalty should not lead us to attach ambiguity to words used by ordinary citizens in everyday conversation.

–B–

Nor do we perceive the statute to be vague as applied to Afanador. An as-applied challenge alleges that a statute "does not with sufficient clarity prohibit the conduct against which it is sought to be enforced." *Cameron, supra,* 100 *N.J.* at 593, 498 *A.2d* 1217. As we noted in *Cameron,* "A party may test a law for vagueness as applied only with respect to his or her particular conduct; if a statute is vague as applied to that conduct, it will not be enforced even though the law might be validly imposed against others not similarly situated." *Ibid.* (citing Laurence H. Tribe, *American Constitutional Law* § 12–29 at 721 (1978)).

Defendant's contention that the statute's failure to define "leader" and "network" renders it vague as applied to him is without merit. Neither expression constitutes an element of the offense. Each serves instead as a shorthand description of the acts necessary to trigger liability. Under the statute criminal liability is based on proof beyond a reasonable doubt that a defendant has conspired as an organizer, supervisor, financier, or manager of at least two other persons to engage for profit in a

course of conduct for the sale, manufacture, or transport of certain controlled dangerous substances. "Leader of a drug-trafficking network" acts as a label for the proscribed conduct, not as an element of it. Although that label, more appropriate to press releases, is ill-suited for inclusion in a criminal statute, its presence in this statute is little more than a harmless, if unnecessary, descriptive touch. Its inclusion may run counter to the proposition that legislatures advance the interests of clarity and precision when they confine the contents of a criminal statute to the elements of the underlying offense and the appropriate punishment for conviction, but it does not render the kingpin statute vague.

We reject also defendant's argument that the use of the term "organizer" renders the kingpin statute vague as applied to his conduct. As we have indicated, *supra* at 171–173, 631 *A.*2d at 951–952, an "organizer" is one who directs the actions of another in a drug-trafficking network. The statute unambiguously targets that action, and therefore the use of the term "organizer" gave clear notice of the potential liability for Afanador's acts.

■ We are satisfied that the statute applies to the activities of which defendant was accused. Although Afanador claims that in deciding his as-applied challenge the Court must presume that the jury convicted him for acting as a "middleman," the jury heard considerable evidence that could reasonably have led it to conclude that defendant had done more than serve as a "go-between" between Officer Ruiz and Montalvo and Acobes. The State's case included testimony that defendant had engaged in activities unambiguously forbidden by the statute.

Specifically, the following evidence would permit a fact finder to conclude that defendant had exerted control over several persons and that he had engaged for profit in drug trafficking: (1) defendant ordered a young woman to find a scale for the first transaction; (2) defendant gave instructions to Popo on a number of occasions, including ordering Popo to send a black car away as defendant and Ruiz negotiated the first purchase; (3) defendant

told Montalvo to count the money from the third transaction, gave Montalvo an additional $100, and asked Montalvo if he "could go up there" to obtain the cocaine for the fourth transaction; (4) on two occasions, persons approached defendant's car and inquired if defendant had acquired "the stuff" or "it"; (5) defendant claimed to have been in the drug business for twenty years and told Ruiz that persons "on the street" owed him large sums of money as a result of his "business"; (6) a large number of cars made quick entrances and exits at defendant's home; and (7) the arresting officers discovered in the trunk of Acobes' car 535 grams of cocaine of eighty-four-percent purity.

To succeed in his as-applied challenge, defendant must show that the kingpin statute did not clearly prohibit his alleged conduct. Although defendant did not rule over a vast criminal empire, the State's evidence, evaluated in its best light, demonstrated that defendant had performed acts clearly prohibited by *N.J.S.A.* 2C:35–3. Therefore the statute cannot be termed "vague" as applied to Afanador's conduct.

## III

Because the Court must presume for the purposes of an as-applied vagueness challenge that the jury accepted the State's evidence and because defendant's alleged acts fall within the statute, defendant's argument that the statute should not be applied to him might alternatively be characterized as a challenge to the sufficiency of the evidence. The charge that the jury verdict was against the weight of the evidence does not focus on whether the State has alleged conduct that violates the pertinent statute; rather it looks to whether the State has offered sufficient proof from which a jury may conclude beyond a reasonable doubt that the defendant committed the crime charged. Although we did not grant certification to consider the sufficiency of the evidence underlying defendant's conviction, because of the severity of the sanctions imposed we have reviewed that issue also.

In examining a trial court's denial of a motion for a new trial based on insufficiency of the evidence, an appellate court may not reverse that ruling "unless it clearly appears that there was a miscarriage of justice under the law." *R.* 2:10–1. "The evidence should be sifted to determine whether any trier of fact could rationally have found beyond a reasonable doubt that the essential elements of the crime were present." *State v. Carter,* 91 *N.J.* 86, 449 *A.*2d 1280 (1982) (citing *Jackson v. Concord Co.,* 54 *N.J.* 113, 253 *A.*2d 793 (1969)).

▇ Defendant's counsel has characterized the State's evidence as "equivocal." We agree. However, a reviewing court should not overturn the findings of a jury merely because the court might have found otherwise if faced with the same evidence. *State v. Hodgson,* 44 *N.J.* 151, 162–63, 207 *A.*2d 542 (1965), *cert. denied,* 384 *U.S.* 1021, 86 *S.Ct.* 1929, 16 *L.Ed.*2d 1022 (1966). Faith in the ability of a jury to examine evidence critically and to apply the law impartially serves as a cornerstone of our system of criminal justice. Unless no reasonable jury could have reached such a verdict, a reviewing court must respect a jury's determination. In the case before us a reasonable jury could determine that the State had proved its case beyond a reasonable doubt. We therefore will not set aside the verdict.

## IV

Finally, we add a note of caution concerning the jury charge in a prosecution under the "drug kingpin" statute. Our dissenting colleagues are of course correct in their insistence that the jury be instructed in sufficient detail as to guide it through the narrow channel that the Legislature created in defining a leader of a narcotics-trafficking network. In this case, however, we take no position on the propriety of the trial court's charge. Our grant of certification was, as noted, a limited one, confined to the "issue of whether *N.J.S.A.* 2C:35–2, the drug kingpin statute, is unconstitutional, facially or as applied." The issue of the jury charge is not only not "inescapable," see *post* at 185, 631 *A.*2d at 958, it is not

even relevant to the discrete issue before us. Moreover, at oral argument defense counsel insisted that "this appeal [is] not[ ] an appeal about the instruction."

The dissent's reliance on *State v. Alexander*, 264 *N.J.Super.* 102, 624 *A.*2d 48 (App.Div.1993), to reverse Afanador's conviction on the basis of the jury charge is hardly appropriate, given the posture of *Alexander* as pending consideration by this Court of the State's petition for certification. The dissent has in effect granted the State's petition and affirmed the Appellate Division judgment in *Alexander*—all this without the benefit of any supplemental briefs, oral argument, or Court conference. Without for a moment denigrating the importance of accurate and informative instructions to aid the jury in its understanding of precisely what conduct is prohibited by the "drug kingpin" act or indeed any other criminal statute, we deal with this appeal as it comes to us, deferring consideration of the jury charge in *Alexander* until that case is properly before us.

## V

We affirm the judgment of the Appellate Division upholding defendant's conviction.

Chief Justice WILENTZ and Justices POLLOCK and GARIBALDI join in this opinion.

Justice O'HERN has filed a separate dissenting opinion in which Justices HANDLER and STEIN join.

O'HERN, J., dissenting.

If society is to win the war on drugs, it must wage that war effectively. Society will not win the war so long as it imprisons only street-level offenders. Profits are the key to the drug trade. Profiteers must be eliminated. Who are the profiteers or kingpins in this trade?

Under the majority's analysis, any three people who agree to sell drugs may be sentenced as kingpins. To test the principle, consider the case of three young people caught up on drugs. Two of them decide to go to New York to buy several hundred dollars worth of drugs. They invite a third with a car to join them. To afford their habit, they decide to sell some of the drugs to others in their neighborhood. One of them arranges the trip to New York and tells the others where to go in the City to get the drugs. Another, on return, decides how to get rid of the extra drugs. Which of these would the Legislature view as a "drug kingpin"? At least two of them fit the majority's definition. Is that all there is to the drug-kingpin law?

I am certain that the Legislature intended more than this. In its own words, the Legislature intended that our laws "must *target for* expedited prosecution and *enhanced punishment* those repeat drug offenders and *upper echelon members* of organized narcotics trafficking networks *who pose the greatest danger to society*." *N.J.S.A.* 2C:35-1.1c (emphasis added). It is those upper-echelon members and kingpins that the Legislature intends to hunt down and punish, not those covered by the dictionary definitions used by the Court.

The majority correctly concludes that the "drug-kingpin" statute, *N.J.S.A.* 2C:35-3, is not, on its face, unconstitutionally vague. *Ante* at 170, 631 *A.*2d at 950. The words of the statute, such as "organizer," "supervisor," "financier," or "manager," are indeed familiar and easily understandable. Although such terms are not vague in themselves, the trial court's failure to relate the terms of the statute to the statutory purposes leaves the jury without the guidance necessary to assess whether the defendant is in fact an "upper-echelon" member of a drug-trafficking network, as was intended by the Legislature for enhanced punishment. Absent instructions relating the general terms of the Act to its purposes, a defendant does not receive a fair trial. It is for that reason that I dissent.

## I

To place the issues of this case in context, we need restate some of the salient history of the Comprehensive Drug Reform Act of 1986 (Drug Act or Comprehensive Act), *L.*1987, *c.* 106; *N.J.S.A.* 2C:35–1 to –23. For that purpose we draw on the article by then Attorney General W. Cary Edwards in the *Seton Hall Legislative Journal.*

Prior to the 1986 Drug Act, New Jersey had ineffective laws for prosecution of drug offenses.

The most notable defect in the system was the failure to provide the courts any meaningful [gradation] scheme by which to distinguish or rank the seriousness of a given drug offense.

\* \* \* \*

The single most important feature of the Comprehensive Act is to transfer the criminal offenses previously defined in the Controlled Act to the New Jersey Code of Criminal Justice. As a result every drug offense will be designated as a crime of a certain specified degree, thereby invoking all of the sentencing provisions found in the penal code. The New Jersey Supreme Court recently predicted that as a direct result of the passage of the Comprehensive Act, the sentencing process of drug offenders "will be made more rational."

\* \* \* \*

In addition to transferring all major drug offenses into the penal code, the Comprehensive Act creates several new offenses designed to address specific problem areas, such as the profits reaped by drug kingpins, and the need to provide special protection for children against the activities of predatory drug distributors. It should be noted, however, that the stern new sentencing provisions envisioned by the Comprehensive Act necessarily address every level and every actor along the distribution chain. While the Act focuses special attention on the activities of the upper echelon drug distributors and profiteers who are the most culpable offenders and who pose the greatest danger to society, the Act does not ignore the need to impose appropriate punishment upon the far more numerous low level dealers and even users. In this way, the Act recognizes that drug kingpins could not operate profitably absent a steady demand for controlled dangerous substances.

[W. Cary Edwards, *An Overview of the Comprehensive Drug Reform Act of 1987,* 13 *Seton Hall Legis.J.* 5, 9, 12, 13 (1989) (footnote omitted).]

The section of the Drug Act before the Court today, aimed at "profiteers" and "drug kingpins," *N.J.S.A.* 2C:35–3, was patterned after the State's racketeering laws. The Drug Act provides that a

mandatory penalty of life imprisonment with a twenty-five-year period of parole ineligibility be imposed on a person convicted as "a leader of a narcotics trafficking network." Under another section of the Act, the Legislature targets repeat offenders, subjecting them to mandatory extended terms of imprisonment. *N.J.S.A.* 2C:43–6f. Moreover, in other sections of the Act, school-zone violators and those who employ juveniles in drug-distribution schemes are subjected to mandatory minimum terms of imprisonment with parole bars. *N.J.S.A.* 2C:35–6 and –7.

Specifically, *N.J.S.A.* 2C:35–3 provides:

A person is a leader of a narcotics trafficking network if he conspires with others as an organizer, supervisor, financier or manager, to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State methamphetamine, lysergic acid diethylamide, phencyclidine or any controlled dangerous substance classified in Schedule I or II, or any controlled substance analog thereof.

The Official Commentary to that section states:

The express purpose of this section is to target for enhanced punishment the upper echelon members, the so-called kingpins, of an organized drug distribution scheme. * * *

Because of the nature of the complex and well-organized hierarchies that may exist in drug trafficking operations, the persons who profit most from these illegal enterprises frequently are able to insulate themselves within the network. This section is specifically aimed at these individuals.

[*Official Commentary to the Comprehensive Drug Reform Act (L.1987, c. 106), reprinted in* 9 *Crim.Just.Q.* 149, 152 (1987).]

Is the majority's construction of the section "aimed at these individuals"?

## II

In a long series of cases, we have held that an essential ingredient to a fair trial is that adequate and understandable instructions be given to the jury. The "charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin,* 119 *N.J.* 2, 15, 573 *A.2d* 1359 (1990). "[E]rroneous instructions on material issues are presumed to be reversible error, excusable only if they are harmless beyond a reasonable doubt." *State v. Crisantos,* 102

*N.J.* 265, 273, 508 *A.*2d 167 (1986). Correct jury charges are necessary for a fair trial. *State v. Green,* 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981).

We have insisted regularly that courts give content to statutory language in their charges to juries. When "an instruction solely in the terms of the language of the statute will not give sufficient guidance to the jury," we have required the definition and construction of pertinent terms for the jury. *State v. Olivio,* 123 *N.J.* 550, 567, 589 *A.*2d 597 (1991). In *Olivio,* we dealt with the need to formulate a standard to define the term "mentally defective" in order to apply *N.J.S.A.* 2C:14–2c(2), sexual assault of a mentally-defective person. We looked to the legislative history of the statute to incorporate within the jury charge the Legislature's concern that the statutory definition be sufficiently narrow so as not to impinge on the consensual sexual activity of only mildly-retarded persons. *Olivio,* 123 *N.J.* at 556, 589 *A.*2d 597.

Earlier, in *State v. Concepcion,* 111 *N.J.* 373, 545 *A.*2d 119 (1988), we explained that "it is not always enough simply to read [to a jury] the applicable provision of the Criminal Code * * *." *Id.* at 379, 545 *A.*2d 119. We held that the charge in *Concepcion* concerning the statutory definition of reckless manslaughter did not adequately guide the jury in determining the defendant's guilt or innocence. The jury requested a clarification of the definition of recklessness. We determined that the jury should have been provided with more than an abstract repetition of the statutory definition. The jury's understanding of the statute should have been clarified by the court providing comparisons or illustrative examples. *Id.* at 381, 545 *A.*2d 119.

In *Town Tobacconist v. Kimmelman,* 94 *N.J.* 85, 462 *A.*2d 573 (1983), on the basis of legislative history, we eliminated statutory language about drug paraphernalia to relieve juries of any confusion with regard to the meaning of the terms in the statute. *See also State v. Ramseur,* 106 *N.J.* 123, 211, 524 *A.*2d 188 (1987) (eliminating the words "outrageously wanton and vile" is a better way to explain to juries the meaning of the c(4)c aggravating

factor of "torture/battery" in a capital case). No reason exists why courts should not add language to relate the terms of a statute to the legislative intent.

## III

In this case, the trial court gave the jury no real guidance about the individuals at whom the kingpin "section is specifically aimed * * *." *Official Commentary to the Comprehensive Drug Reform Act, supra,* 9 *Crim.Just.Q.* at 152. The jury was not instructed that in order to find the defendant guilty under *N.J.S.A.* 2C:35–3, his behavior should have been that of an upper-echelon member of a drug network. As charged, the jury could have applied this statute to any street-level seller as long as there were two others involved in the deal.

In a recent decision, the Appellate Division provided direction as to how the "drug-kingpin" law should be explained to juries. *State v. Alexander,* 264 *N.J.Super.* 102, 624 *A.*2d 48 (App.Div. 1993) (certification pending). The court stated:

> A jury called upon to determine whether a defendant is a "leader of a narcotics trafficking network" within the meaning of *N.J.S.A.* 2C:35–3 should be instructed, in substance, that to justify conviction, the State must prove beyond a reasonable doubt that during the period alleged in the indictment the defendant functioned as an "upper echelon member" of an organized "drug trafficking network" and, in that capacity, conspired "with others as an organizer, supervisor, financier or manager to engage for profit in a scheme or course of conduct to unlawfully manufacture, distribute, dispense, bring into or transport in this State" any of the controlled dangerous substances enumerated in the statute. "Organized 'drug trafficking network'" should be defined as a group of individuals who, by reason of their number and interrelationships, constitute a structured organization or system engaged in the manufacture or distribution of illegal drugs. "Upper echelon member" should be defined as someone who stands on an upper level of the chain of command of a drug trafficking network, exercising command authority over members of that organization whose status is subordinate to his. An "upper" level is a level which is superior to street-level distributors and to their immediate supervisors or suppliers.
>
> [*Id.* at 110–11, 624 *A.*2d 48 (footnote omitted).]

Because an instruction of that sort had not been given to the jury, the court held that the jury "did not determine whether defendant's status and activities warranted the punishment which the Legislature has reserved for a 'leader of a narcotics trafficking

network.'" *Id.* at 111, 624 *A.*2d 48. While we might wish to qualify the last sentence of the Appellate Division's formulation of a charge, I believe that jury instructions closely following the *Alexander* proposed charge must be given.

Although the defendant in this case has not posed his arguments in this same way and our grant of certification was limited to the "issue of whether *N.J.S.A.* 2C:35-3, the Drug Kingpin statute, is unconstitutional, facially or as applied," the issue of the jury charge is inescapable. In effect, the statute was applied unconstitutionally because it was applied too vaguely to guide the jury's function. Besides, the issue must be resolved in this case or in *Alexander, supra.* I would resolve it now as the Appellate Division panel did in *Alexander.* 264 *N.J.Super.* at 110–11, 624 *A.*2d 48. I believe that construction best advances the goals of the 1986 Comprehensive Drug Reform Act.

Other jurisdictions have similarly approached drug-kingpin laws. In *Williams v. State,* 329 *Md.* 1, 616 *A.*2d 1275, 1284 (1992), the court analyzed the state's "drug-kingpin" statute in light of legislative intent and found that it "must read the words 'organizer,' 'supervisor,' 'financier,' and 'manager' in light of the independent connotations of the word 'kingpin.'" The court believed that to do otherwise would "impermissibly render surplusage the crucial words 'Drug Kingpin,' by which the statute is entitled." *Ibid.;* see also *State v. Moeller,* 105 *Or.App.* 434, 806 *P.*2d 130, 133 (holding that Oregon's enhanced sentencing statute for drug kingpins violates its state constitution because the Act contained the phrase "part of a drug cultivation, manufacture or delivery scheme or network" that was "susceptible to an abundance of possible meanings and applications, all or none of which may be the intended ones"), *rev. allowed,* 311 *Or.* 349, 811 *P.*2d 144, *rev. dismissed,* 312 *Or.* 76, 815 *P.*2d 701 (1991) (before review by the Oregon Supreme Court, the Legislature amended the law). Although the words "drug kingpin" or "upper-echelon member" do not appear in the title of *N.J.S.A.* 2C:35-3, it is overwhelmingly clear that these are the individuals that the Legislature means to punish.

The jury charge in this case did not make any reference to the legislative purpose to convict "upper-echelon member" or "drug kingpin" and therefore provided insufficient guidance for the jury to determine whether defendant was in fact a leader of a narcotics-trafficking network. The consequences of the jury's finding of guilt—that is, life imprisonment—are too high to permit speculation about what the jury might have thought the statute meant. *State .v. Grunow*, 102 *N.J.* 133, 148, 506 *A.*2d 708 (1986). One juror, when polled, qualified a vote of guilt on the "kingpin" count as "[a]ssuming * * * the key word which was listed in the charge was or * * *." The juror was referring to the court's charge that the statute was to be read in the disjunctive in defining the leader of the drug-trafficking network "as an organizer, supervisor, financier *or* manager." (Emphasis added). We can expect that such a juror, carefully parsing the words of the statute, would apply with equal care the Legislature's intention to target for conviction the "upper-echelon member" and not just one who organizes a trip for two street-level offenders. Paradoxically, the transcript recites that immediately after the jury was polled a "spectator" was heard to say, "[t]hat's unfair about the kingpin charge."

I would resolve now the question of how the drug-kingpin law should be charged to a jury. I believe that we will conclude that a correct jury charge must relate the terms of the statute, such as "organizer, supervisor, financier or manager," to the legislative purpose to target profiteers and kingpins in the upper echelons of the drug trade. The absence of such a charge requires that we reverse the conviction under *N.J.S.A.* 2C:35–3 and remand for retrial of that charge.

Justices HANDLER and STEIN join in this opinion.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, POLLOCK and GARIBALDI—4.

*For reversal and remandment*—Justices HANDLER, O'HERN and STEIN—3.