933 A.2d 978 (2007)
396 N.J. Super. 329
STATE of New Jersey, Plaintiff-Respondent,
v.
Michele DIXON, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 2007.
Decided October 24, 2007.
*979 Yvonne Smith Segars, Public Defender, attorney for appellant (Patrick T. Cronin, Designated Counsel, on the brief).
Bruce J. Kaplan, Middlesex County Prosecutor, attorney for respondent (Simon Louis Rosenbach, Assistant Prosecutor, of counsel and on the brief).
Before Judges S.L. REISNER, GILROY and BAXTER.
*980 The opinion of the court was delivered by
S.L. REISNER, J.A.D.
Defendant appeals from her conviction, following a jury trial, for second-degree conspiracy to commit both second-degree robbery and first-degree bias intimidation based on the victim's handicap. N.J.S.A. 2C:5-2.[1] She also appeals from the sentence imposed.
We affirm defendant's conviction for conspiracy to commit robbery and affirm the sentence of three years, subject to NERA, imposed for that offense. We reverse defendant's conspiracy conviction insofar as it was premised on bias intimidation as a predicate offense, because the trial judge incorrectly charged the jury on the definition of "handicap." We conclude that for purposes of the bias intimidation statute, N.J.S.A. 2C:16-1, the term "handicap" should be defined as it is in the Law Against Discrimination, N.J.S.A. 10:5-5q.

I
We begin by reviewing the pertinent facts as they bear on the significance of the jury instruction. The events that gave rise to the indictment occurred on July 10, 2003.
According to Patrick Murray's trial testimony, he was employed as a shopping cart retriever at the Pathmark store. He explained that in July 2003 he was temporarily living with defendant's husband, Douglas Dixon (Douglas) and Douglas' five year old daughter. He was paying Douglas $70 a week to stay in a curtained-off portion of the living room. The remaining portion of the rent was paid by "Section Eight;" Murray's $70 represented the "deductible" or Douglas' share of the rent. This arrangement went on for several months. Murray believed that Douglas and defendant were separated at the time, but defendant came to the apartment from time to time to visit their daughter. According to Murray, at some point defendant had Douglas arrested for failure to pay child support. After Douglas went to jail, Murray paid his share of the rent directly to the landlord.
Murray testified that at some point after Douglas went to jail, Douglas' nephew Shawn Hodge came to the apartment at night, woke Murray up, and told him "You owe my uncle $280." Murray insisted that he did not owe the money, that it had been paid. Hodges responded that Murray would have to leave the apartment. Accordingly, Murray moved out and took up residence in the Pathmark employee lounge. On the following Thursday, Murray received his paycheck of between $325 and $350 and cashed it in the Pathmark store. While he was outside "pushing carts," defendant, who was accompanied by her small child and two large men, approached Murray and said that he owed her husband $280. Murray tried to explain his arrangement with Douglas and *981 said "As far as I'm concerned your husband and I are even." When one of defendant's companions tried to hit Murray, defendant said "No. Don't hit him now."
Murray went into the store and up to the employee lounge. The two men appeared a few minutes later and told him to follow them into the bathroom or they would "F" him up. The men pinned Murray against a couch, but he was able to break away and lock himself in a bathroom stall. The two men started banging on the stall door and demanding "the money." According to Murray, he had epilepsy and began to be afraid he would have a seizure. To get the men to go away, he took some bills from his wallet and slid the bills through a crack in the stall door. He did not give the men all of his money; he did not know how much he gave them. The men then left the bathroom and defendant followed them out and down the stairs. He did not see defendant in the store. On cross-examination, Murray admitted that after he gave the men the money, Hodge told him that "now that everything is even you can move back in if you want. I'll even give you the key." Murray agreed that the money the men were trying to get from him was "the last four months of the deductible," which was $280. However, Murray declined the offer to move back into the apartment.
According to witness Brandon Raver, defendant asked Raver and his friend Abdella to give her and Shawn Hodge a ride to the local Pathmark store. According to Raver, outside the store he saw Hodge and defendant approach Patrick Murray, who worked at Pathmark. He heard Murray protesting that he did not owe defendant and Hodge any money, and heard defendant tell Hodge "Don't hit him now." Murray went into the store with defendant and Hodge following him.
After a few minutes, Raver went into the store to find defendant and Hodge. He found Hodge and Murray in the bathroom and saw Murray giving Hodge some money. On cross-examination, Raver admitted he heard Murray say "Now that you have my money we're even." One of the other men responded "[y]es, we're even" and told Murray that he could now move back into Douglas Dixon's home. Raver, Hodge and defendant then returned to the car, and Raver heard defendant say "[t]hat was easy."
Beverley Robinson, a Pathmark employee, witnessed the confrontation between Murray and two other people outside the store. She heard the woman tell Murray that he owed her money and that "We will be back later for our money." According to Robinson, one of the men with the woman was "going to come after Patrick ready to hit him", but the woman said "Don't hit him. Don't hit him." Robinson saw Murray walk away to continue putting away the shopping carts, which was his job, and she then went back into the store to resume her own work. Robinson was unable to identify defendant as the woman she saw.
Gloria Wisnack, another Pathmark employee, testified that Murray worked as a cart person. Wisnack called Murray "a special person," because "I think he has some medical problems." She testified that she saw two tall black men enter the men's bathroom on the second floor of the store. Although she was sitting nearby, she did not hear any banging or unusual noise coming from the bathroom. After the two men emerged from the bathroom about ten minutes later, Murray came out looking upset. Based on what he told her, she went looking for the two men but did not find them in the store.
According to the investigating police officer, Murray told him that two males approached *982 him in the bathroom and took money from him. Murray also alleged that defendant was present with the men upstairs in the Pathmark. The officer testified that Murray "suffers from epilepsy. He is a little difficult. I would say slow. He shows some kind of handicap." After police arrested defendant, she told them that Murray lived in her ex-husband's apartment. She said Murray was "a little slow" but she knew he could read because he used to read to her daughter. Defendant admitted going to Pathmark to buy groceries with Raver, Hodge and a third man whom she did not know, who was driving the car. She contended to the police that she had no idea that the two men were going to try to rob Murray and that she was not involved in that incident. The officer also admitted that defendant and Murray both told him that defendant's five year old child was with her at the Pathmark.
At trial, defendant testified that she and Douglas Dixon had joint custody of their daughter until he went to jail. She testified that on July 10, 2003, Hodges came to her house and asked her to help him cash Douglas' social security checks.[2] She declined, but asked them for a ride to her husband's house to pick up baby clothes. She testified that she, her daughter, Raver, Hodge, and another man, drove over to Douglas' apartment to pick up some of their daughter's clothes. On the way, they stopped at Pathmark and she bought her daughter some pudding. She denied speaking to Murray at all or having any involvement in the activities of the men who took money from him. On cross-examination she admitted knowing that Murray had "a disability." However, she also testified that although he seemed "a little slow," he was also "normal."
In instructing the jury, the trial judge charged them that to prove bias intimidation, the State must prove that defendant committed the underlying crime of robbery and that she committed the crime "with the purpose to intimidate Patrick Murray because of the victim's handicap." The judge also charged that "[p]roof that the target of the underlying crime of robbery, second degree, was selected by the defendant or another acting in concert with the defendant because of handicap shall give rise to a permissive inference the defendant acted with the purpose to intimidate an individual because of handicap."
During deliberations, the jury asked a question: "What is the definition of bias intimidation, first degree?" The court instructed the jury that
a person is guilty of the crime of bias intimidation if he attempts to commit, conspires with another but basically here the word is commits an offense. Here it would be robbery, second degree, with a person to intimidate an individual and the statute is because of race, color, religion, gender, handicap, sexual orientation or ethnicity. In this case the only thing that could possibly apply is handicap. . . .
The definition of handicap according to Webster's Seventh New Collegiate says a disadvantage. It means a disadvantage.
[Emphasis added.]

II
On this appeal, defendant raises the following points for our consideration:
POINT I: THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS INSTRUCTION ON THE TERM *983 "HANDICAPPED" WITHIN THE MEANING OF N.J.S.A. 2C:[16]-1.
POINT II: THE JUDGMENT ENTERED UNDER COUNT 1 OF THE INDICTMENT MUST BE VACATED SINCE IT IS NOT SUPPORTED BY CREDIBLE EVIDENCE IN THE RECORD.
POINT III: DUE TO THE NATURE OF THE BIAS INTIMIDATION STATUTE, YOU CANNOT BE CONVICTED OF CONSPIRACY TO COMMIT BIAS INTIMIDATION WHERE THE UNDERLYING PREDICATE ACT IS CONSPIRACY TO COMMIT AN ENUMERATED OFFENSE.
POINT IV: THE SENTENCE IMPOSED BY THE TRIAL COURT WAS EXCESSIVE.
POINT V: THE SENTENCE IMPOSED BY THE TRIAL COURT WAS INCONSISTENT WITH THE SUPREME COURT'S HOLDING IN STATE V. NATALE.

Because we agree that error in the jury instruction requires reversal of defendant's conviction with respect to bias intimidation, we do not address defendant's Points II through IV. Point V is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Thus, we turn to Point I.
The jury charge did not define the term "handicap" at all. In response to the jury's question concerning the definition of bias intimidation, the trial court gave the jury a definition of "handicap" to which defendant did not object. Therefore, we consider defendant's appellate challenge to that definition under the plain error rule. R. 1:7-2; R. 2:10-2.
In this case, we conclude that the definition the court provided the jury was clearly erroneous, because it in no way connected the victim's "disadvantage" to his physical or mental disability. The victim could have been "disadvantaged" in this case because he was outnumbered two to one by large assailants. In failing to properly define the term "handicap" the court in effect relieved the State of its burden of proving a key element of its case.
The issue of the proper definition of the term, for purposes of the bias intimidation statute, was addressed in State v. Allen, 334 N.J.Super. 133, 756 A.2d 1087 (Law Div.2000). In holding that the bias intimidation statute was not unconstitutionally vague, the court searched for an appropriate definition of the term "handicapped."
When interpreting criminal statutes, the court looks to common definitions, the context of the words that they are associated with in the statute, and the intent of the Legislature. State v. Afanador, 134 N.J. 162, 631 A.2d 946 (1993); State v. Mortimer, supra[, 135 N.J. 517, 641 A.2d 257 (1994)]. "Absent any explicit indications of special meanings, the words used in the statute carry their ordinary and well understood meanings." State v. Afanador, 134 N.J. at 171, 631 A.2d 946.
[Id. at 137-38, 756 A.2d 1087.]
After considering the somewhat different definitions set forth in the Law Against Discrimination, N.J.S.A. 10:5-1 to -49, and the Americans With Disabilities Act, 42 U.S.C. §§ 12132 to 12213, the court settled on a dictionary definition instead:
When all else fails, there is always plain language and common sense. It is permissible to adopt the simplicity and brevity of Webster's Dictionary. Webster's Dictionary defines handicapped as, "having a physical or mental disability that substantially limits activity." A disability means, "incapacitated by illness, injury or wound." Webster's Dictionary *984 359 (9th ed.1988). This court adopts Webster's Dictionary definition of handicapped with the following observations. A disability, disease or defect must be of such a nature, that a reasonable person in the position of the defendants would be on fair notice that E.K. is handicapped. The term "substantially limits" refers to severity, duration and permanency. "Activity" refers to major life activities such as, but not limited to, the use of one's five senses, ability to ambulate and substantial cognitive deficiencies. An enumeration of all possibilities is fruitless. Common understanding and the specific facts of a case will provide adequate focus to sharpen the amorphous.
[Id. at 139, 756 A.2d 1087 (citation omitted).]
The definition adopted in Allen is certainly clearer than the one the trial court used here. However, in incorporating the dictionary definition of "disability," the Allen court unduly limited the definition to apply only to those who are "incapacitated" by their condition. A person can be handicapped without being incapacitated. The victim in this case is a good illustration. Even though he was apparently somewhat developmentally disabled, he was able to work and to live independently, he was able to read, and as we gather from reading the trial transcript, he was fairly articulate.
Our State has had a Law Against Discrimination (LAD) on the books since 1945, and over the years it has been the State's central legislative bulwark against discrimination. N.J.S.A. 10:5-1 to -49. See David v. Vesta Co., 45 N.J. 301, 327, 212 A.2d 345 (1965); Goodman v. London Metals Exchange, Inc., 86 N.J. 19, 30-31, 429 A.2d 341 (1981); Andersen v. Exxon Co., U.S.A., 89 N.J. 483, 491-92, 446 A.2d 486 (1982). At the time of the offense, the LAD defined "handicapped" comprehensively as:
suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.
[N.J.S.A. 10:5-5q (1996).]
In 2003, the LAD was amended to delete the term "handicap" and substitute "disability." P.L. 2003, c. 180 (effective January 1, 2004). The current definition of the term remains essentially the same.
"Disability" means physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy and other seizure disorders, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial appliance or device, or any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions *985 which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Disability shall also mean AIDS or HIV infection.
[N.J.S.A. 10:5-5q.]
We have canvassed the legislative history of the bias intimidation statute, N.J.S.A. 2C:16-1, and its predecessor, N.J.S.A. 2C:44-3e, and have found no indication in the history as to how the Legislature intended to define handicap in either statute.[3] However, we conclude that the bias intimidation statute should be read in pari materia with the LAD.
"Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object." 2B Norman J. Singer, Sutherland Statutory Construction, § 51.03, at 138 (5th ed.1992); State v. DiCarlo, 67 N.J. 321, 325 [338 A.2d 809] (1975) (stating that identity or similarity of purpose or object most convincingly justifies resort to rule of in pari materia as aid in statutory construction). [Richard's Auto City, Inc. v. Dir., Div. of Taxation, 140 N.J. 523, 540, 659 A.2d 1360 (1995).]
We are also cognizant that "[w]hile dictionary definitions may be employed to define imprecise terms, a simple canvassing of dictionaries does not provide a definitive answer unless we are first able to determine the sense in which the Legislature used the term." State v. N.I., 349 N.J.Super. 299, 310, 793 A.2d 760 (App.Div.2002). Given the primacy of the LAD in the State's legislative fight against discrimination, and the parallel purposes of the two statutes, we perceive no reason why the Legislature would have intended a different definition of handicap when it adopted the bias intimidation statute.
We agree with Allen that the victim's handicap must be of such a nature that the defendant is on "fair notice" of it. State v. Allen, supra, 334 N.J.Super. at 139, 756 A.2d 1087. However, the scienter requirement addresses that issue. That is, to be guilty of bias intimidation, a defendant must know that the victim is handicapped[4] and must intentionally choose to victimize that person because of the person's handicap. Victimizing someone who happens to be handicapped, but without choosing the victim because of the handicap, is not a violation of the bias intimidation statute.
We also agree with Allen that persons who are victims of bias intimidation because of their handicapping conditions are often chosen because of a perception of their greater vulnerability to intimidation. However, that is not always the case. A person may be subjected to bias intimidation because of prejudice related to disfigurement or to the perceived stigmatism of a disease. The LAD definition is sufficiently broad to cover all those whom the Legislature sought to protect from criminal attacks based on their physical or mental handicaps.
Returning to this case, the definition of "handicap" given to this jury was plainly erroneous. Because correct jury instructions are so essential to a fair trial, giving the jury its road map to the *986 law which must be applied to the facts, erroneous jury instructions are presumed to "possess the capacity to unfairly prejudice the defendant." State v. Bunch, 180 N.J. 534, 542, 853 A.2d 238 (2004); State v. Reddish, 181 N.J. 553, 613, 859 A.2d 1173 (2004). However, in applying the plain error rule to an incorrect jury charge, we must still consider the error in the context of the entire charge and the entire record.
As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Hock, 54 N.J. 526, 538 [257 A.2d 699] (1969), cert. denied, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). The alleged error is viewed in the totality of the entire charge, not in isolation. State v. DiFrisco, 137 N.J. 434, 491 [645 A.2d 734] (1994). In addition, any finding of plain error depends on an evaluation of the overall strength of the State's case. See State v. Cotto, 182 N.J. 316, 326-27 [865 A.2d 660] (2005).
[State v. Chapland, 187 N.J. 275, 289, 901 A.2d 351 (2006).]
Given the evidence in this case, the error had a clear capacity to produce an unjust result by relieving the State of the burden of proving its case, that is, specifying and proving what handicap(s) the victim had and proving that defendant singled out the victim for robbery because of one or both handicaps.
While the State presented a strong case that defendant was guilty of conspiracy to commit robbery, the State's conspiracy case was not as strong on the issue of bias intimidation. Although defendant claimed she had nothing to do with the incident, the evidence would support a reasonable inference that after having her ex-husband jailed for failing to pay child support, she was trying to exercise self-help by collecting overdue rent from his tenant. Murray admitted that the $280 Hodge was demanding from him represented four weeks worth of rent, and he admitted that after he gave Hodge and Raver the money, Hodge told him he could move back into the apartment. Reasonable jurors could have concluded that there was a "back story" to this incident, and that Murray was not singled out due to his developmental disability but rather due to his status as a tenant.
By defining "handicap" as "a disadvantage," the charge permitted the jury to gloss over or avoid focusing on whether Murray had a disability, what the disability was, and whether defendant singled him out to be victimized because of that disability. Rather, the charge may have led the jury to focus on whether defendant conspired to place Murray at a disadvantage by recruiting two larger men to confront Murray and strong-arm him into paying the $280. In this case, where there was a plausible basis for the incident that did not involve bias intimidation, the error had a clear capacity to produce an unjust result. Accordingly, we reverse defendant's conviction for conspiracy premised on bias intimidation as the predicate offense.
We next address the impact on defendant's conspiracy conviction in the somewhat unusual circumstances of the indictment. The bias intimidation statute contains its own separate prohibition against conspiracy to intimidate a victim based on handicap. N.J.S.A 2C:16-1. However, the State did not indict defendant for a conspiracy under N.J.S.A. 2C:16-1. Instead, defendant was indicted for violating the ordinary conspiracy statute, N.J.S.A. 2C:5-2. The State concedes *987 that because defendant was indicted and tried for ordinary conspiracy, N.J.S.A. 2C:5-2, which is treated as a degree lower than a predicate first-degree offense, rather than under the separate bias crime conspiracy statute, N.J.S.A. 2C:16-1, which is itself a first-degree crime, the trial court erred in sentencing defendant as though she had been convicted of a first-degree crime. See N.J.S.A. 2C:5-4a (Conspiracy to commit a first-degree crime is treated as a second-degree crime. Otherwise, conspiracy is a crime of the same degree as the most serious crime which is attempted.).
Because we conclude that the jury instructions did not properly define the term "handicap" and that this constituted plain error, we reverse the conspiracy conviction insofar as it was premised on bias intimidation, a first-degree crime. However, the verdict sheet required the jury to specify separately which predicate crimes (robbery and/or bias intimidation) it found for the conspiracy; the jury answered yes to robbery and yes to bias intimidation. Hence, the verdict sheet provides a basis to affirm defendant's conviction for conspiracy to commit robbery, and the evidence amply supports that conviction. We, therefore, affirm the conspiracy conviction insofar as it was premised on robbery, a second-degree crime.
With respect to the sentence, the trial judge accepted defendant's contention that the mitigating factors outweighed the aggravating factors as to both the bias crime conspiracy and the robbery conspiracy. Hence, he sentenced defendant as a third-degree offender on the robbery conspiracy and imposed a three-year sentence subject to NERA. The State abandoned its appeal of the judge's sentencing decision, and we affirm the three-year NERA sentence.
The judge likewise imposed a second-degree sentence for the bias conspiracy, in the mistaken belief that the conviction was for a first-degree crime rather than a second-degree crime. Based on his remarks at sentencing, we have no doubt that had the judge been aware that the conviction was for a second-degree crime, he would have sentenced defendant as a third-degree offender on this aspect of the conspiracy also and would have imposed the minimum sentence for this third degree crime, i.e., a "flat" three years. Since defendant would in no event receive a longer sentence than three years subject to NERA, no purpose would be served by remanding this case for re-trial on the bias intimidation aspect of the conspiracy charge, even if such a re-trial would be otherwise lawful, an issue we need not address.
We reverse that aspect of the conspiracy conviction that is based on bias intimidation as a predicate offense and vacate the associated seven-year sentence. We affirm defendant's conviction for second-degree conspiracy to commit second-degree robbery and affirm the imposition of the three-year sentence subject to NERA for that conviction. We remand for correction of the judgment of conviction in accordance with this opinion.
Finally, we note that the model jury charge on bias intimidation does not contain a definition of "handicap" and that the term should be defined in the model charge. For that reason we recommend the issue to the Model Criminal Jury Charge Committee for its consideration.
Affirmed in part, reversed in part.
NOTES
[1] Defendant was acquitted of second-degree robbery, N.J.S.A. 2C:15-1, and first-degree bias intimidation, N.J.S.A. 2C:16-1. She was convicted of conspiracy to commit robbery and bias intimidation. The State concedes that the latter charge encompassed only one conspiracy and resulted in only one second-degree conviction. See N.J.S.A. 2C:5-2c; State v. Hardison, 99 N.J. 379, 390 n. 4, 492 A.2d 1009 (1985). Defendant was, however, sentenced for two separate crimes. The court characterized the bias crime conspiracy as a first-degree offense but sentenced her to seven years in prison as though it were a second-degree offense, due to preponderating mitigating factors. The court imposed a concurrent three year sentence, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, for the robbery conspiracy. In light of our disposition of the appeal, we need not address the propriety of imposing a concurrent sentence for a NERA offense in this context.
[2] She testified that she had no right to collect Douglas' rent while he was incarcerated.
[3] The history and purpose of the predecessor statute, N.J.S.A. 2C:44-3e, was reviewed at length in State v. Apprendi, 159 N.J. 7, 13-17, 731 A.2d 485 (1999), rev'd and remanded sub. nom Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).
[4] We do not address here the situation of an assailant who attacks a victim because of a mistaken perception that the person is handicapped.