58 A.3d 1205

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. DAVID T. POMIANEK, JR., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted October 23, 2012—Decided January 30, 2013.

342

Before Judges REISNER, HARRIS and HOFFMAN.

*F. Michael Daily, Jr.*, attorney for appellant.

*Jeffrey S. Chiesa,* Attorney General, attorney for respondent (*Mary E. McAnally,* Deputy Attorney General, of counsel and on the brief).

*Seth Grossman & Robert Loefflad,* attorneys for amicus curiae The Rutherford Institute (*Seth Grossman,* on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

In connection with an incident in which an African–American co-worker was locked in an equipment cage and taunted, defendant David Pomianek, a public employee, was convicted by a jury of harassment by communication, *N.J.S.A.* 2C:33–4a, and harassment by alarming conduct, *N.J.S.A.* 2C:33–4c. Based on those two predicate offenses, the jury convicted defendant of bias intimidation pursuant to *N.J.S.A.* 2C:16–1a(3). The jury also convicted defendant of official misconduct, *N.J.S.A.* 2C:30–2a.

We conclude that *N.J.S.A.* 2C:16–1a(3) would be unconstitutional if it permitted a defendant to be convicted of a bias offense based on the victim's perception of the defendant's conduct, without requiring the State to prove defendant's biased intent in committing the underlying crime.[1] To avoid an interpretation that would render the provision unconstitutional, and to effectuate the Legislature's purpose in enacting the statute, as reflected in the legislative history, we conclude that subsection (3) requires proof of defendant's biased intent.

Because the trial court charged the jury that for purposes of subsection (3), it should consider the victim's perception of the

---

[1] Defendant was acquitted of violating the other two provisions of the bias crime statute, *N.J.S.A.* 2C:16–1a(1) and –1a(2), and the validity of those provisions is not at issue on this appeal.

crime rather than defendant's intent in committing it, defendant's conviction for bias intimidation based on *N.J.S.A.* 2C:16–1a(3) must be reversed. We also reverse the conviction for official misconduct, because it was based solely on the underlying, invalid conviction for bias intimidation. We affirm the harassment convictions and remand for re-trial on the charges of bias intimidation, *N.J.S.A.* 2C:16–1a(3), and official misconduct, *N.J.S.A.* 2C:30–2a.[2]

## I

### A.

In challenging his conviction, defendant raises the following issues:

A. Standard of Review Governing Claims of Violations of Constitutional Rights.

Point I

The State Deprived the Defendant of His Right to a Speedy Trial as Guaranteed by the Sixth Amendment and the Judgment Below Should Be Reversed.

Point II

The Prosecution of the Defendant Offended Fundamental Fairness.

Point III

The New Jersey Bias Crimes Statute, *N.J.S.A.* 2C:16–1 Violates the First and Fourteenth Amendments.

B. Scope of Review of Denial of Motions for Acquittal and/or for a New Trial.

Point IV

There Was Insufficient Evidence to Sustain a Conviction of Harassment under *N.J.S.A.* 2C:33–4(a) and the Defendant Should Have Been Granted an Acquittal as to That Charge or in the Alternative Afforded a New Trial.

Point V

There Was No Evidence Presented to Establish That the Defendant Engaged in a "Course of Alarming Conduct" Which Would Sustain a Conviction under Subsection C of the Harassment Statute.

Point VI

---

[2] Whether or not the State decides to re-try defendant, nothing in this opinion would preclude defendant's employer from seeking, through civil administrative channels, to terminate his employment for conduct unbecoming a public employee.

The Convictions of Bias Intimidation Should Have Been Dismissed by the Trial Court.

Point VII

There Was Insufficient Evidence to Support the Conviction of Misconduct in Office.

C. Scope of Review of Trial Errors.

Point VIII

The Court's Refusal to Permit the Introduction of Evidence Regarding Motive on the Part of The Employer of All of the State's Witnesses Prevented the Defendant From Being Afforded a Fair Trial and Conducting an Adequate Defense.

Point IX

The Prejudice of the 404(b) Evidence Admitted by the Court Outweighed Its Probative Value and It Should Not Have Been Admitted.

Point X

In This Case Where the Jury Had to Make So Many Findings on So Many Different and Varying Crimes It Was Error Not To Instruct Them That They Had to Be Unanimous on Each Element of Each Crime.

## B.

To put the legal issues in context, we summarize the pertinent trial evidence. The Gloucester Township Department of Public Works has three divisions: the Parks and Recreation Department (Parks Department), the Roads and Streets Department (Roads Department), and the Maintenance Department. In April 2007, the supervisor of work crews at the Parks Department was Len Moffa; the director of the Parks Department was Gabe Busa; and the head of the Roads Department was Robert Tulino.

In October 1997, defendant was appointed to the permanent position of custodian, and by March 2002, he had been promoted to the position of truck driver in the Parks Department. Michael Dorazo was also a truck driver in the Parks Department. Defendant and Dorazo, both Caucasian, were "really good friends."

During the "leaf season," which can extend from October 1 to the first week of January, the work crews from the Parks Department and the Roads Department combined to pick up leaves. At

that time, the employees worked in teams of three, consisting of one truck driver and two laborers.

In November or December of 2006, defendant, Dorazo, and several laborers were working as a group performing leaf collection. The laborers included Steven Brodie (Brodie or the victim), his brother Robert Brodie (Robert), and Rashaan McDaniel, all of whom are African–American.

According to Brodie, defendant drove up behind Dorazo's truck, exited his own truck, and walked up to Dorazo, who gave him two bungee cords, each about a foot long and fastened together. Dorazo then returned to his truck, driving the vehicle forward while McDaniel vacuumed leaves with a device attached to the truck. Brodie testified that, at one point, while the vacuum was operating, defendant tapped McDaniel once or twice lightly on the shoulder with the cords. Defendant did not say anything to McDaniel while tapping him; he did not make any racial comments. Thereafter, a "wrestling match" ensued among defendant, McDaniel, and Robert.

When asked why he viewed defendant's behavior as "racial," Brodie testified, "I took it as ... geared towards slavery because you have a black man working and he's getting whipped as he's working. That was how I took it."

McDaniel remembered the whipping incident differently. According to McDaniel, defendant was driving his truck, while McDaniel operated the leaf vacuum attached to the truck; Robert was there also. At some point, defendant stopped the truck, exited, and began wrestling with McDaniel and Robert. At that juncture, Dorazo exited his truck, and then found in a leaf pile a "stick with a rope on it" that looked "kind of like a horse whip."

McDaniel testified that Dorazo cracked the stick and rope at his feet more than once and then handed the stick and rope to defendant, who also cracked it at McDaniel's feet. While this was going on, McDaniel observed that Brodie was "pretty upset," yelling for everyone to stop the activity. After defendant finished

cracking the stick and rope, he handed it to Dorazo, who put it into his truck. The men then returned to their work. McDaniel did not remember being touched by the stick and rope while it was being wielded by defendant and Dorazo, and he testified that defendant did not make any racially derogatory remarks during the incident. McDaniel viewed the wrestling as just "fun and games" but he felt the use of the stick and rope was racist and offensive.

Brodie reported the whipping incident to Tulino the next day, but no one was reprimanded. Tulino did, however, temporarily assign Brodie and the others to work with truck drivers other than defendant and Dorazo.

There was also evidence, presented by the defense, that defendant was previously disciplined for playing inappropriate practical jokes on Caucasian employees. In one incident, defendant got into a tussle with an employee in the lunchroom, after defendant threw crackers at the employee's head. In the other episode, defendant was disciplined for throwing tomatoes at a fellow employee.

The events underlying the criminal charges took place on April 4, 2007. There was heavy rain and the Township's work crews were sent to the old Public Works building, which was largely used for equipment storage. Inside the building was a "cage" that was affixed to a wall, nine feet above the floor level. The cage was accessible by way of a thirteen-step staircase that ended with a small landing by the cage door. The cage was sixteen feet wide, eight feet deep, and eight feet high, with chain-link fence walls on three sides and a concrete wall on its fourth side. It had a sliding chain-link fence door that was secured with a padlock. The top of the cage was open and about seventeen feet above the floor.

According to Brodie, the work crews in the old Public Works building were acting "out of control, like a lot of footballs were being thrown around, a lot of laughing, wild—wild stuff, stuff that shouldn't have been going on." Brodie testified that, at some point, defendant was wrestling in the cage with another Caucasian

employee, Michael Schaffer. When Schaffer exited the cage, William Grasmick, Jr., who is also Caucasian, closed the cage door and attempted to hold it shut. Defendant, however, managed to push the door open and escape from the cage. Shortly after that, Brodie got locked in the cage.

According to Brodie, Dorazo approached him and said that "Len Moffa wanted us to grab something out of that cage." Because Dorazo referred to Moffa, Brodie construed Dorazo's comment to be a "work-related" request by a supervisor; he would not have accompanied Dorazo to the cage otherwise. Brodie climbed the staircase to the cage, followed by Dorazo. At that time, defendant was seated on an old lawn mower on the floor of the building, where he remained throughout the incident. Several other employees were also in the area.

Brodie entered the cage and asked Dorazo where the requested equipment was. Dorazo then closed the cage door and secured it with a padlock. For a moment, Dorazo stood smoking a cigarette, with "a smirk on his face," after which he descended the steps. Other employees were laughing at Brodie's predicament, and Brodie felt humiliated and embarrassed.

About a minute after he was locked in the cage, Brodie heard defendant remark, " '[o]h, you see, you throw a banana in the cage and he goes right in.' " Brodie did not hear defendant utter the word "monkey" as part of his remark. Brodie testified that he would have remembered if defendant used the word "monkey" and that if other witnesses stated that he used the word "monkey," they were wrong.

When asked how he interpreted defendant's reference to a banana, Brodie testified, "I took it as though I was being called a monkey." Additionally, Brodie immediately considered defendant's remark to be "racial" in nature because "I was locked in a cage like an animal. And the fact that he said throwing the banana in there, I took it [as a] reference ... to me being called a monkey in a cage." When asked how he knew that defendant's remark concerned him, Brodie testified that "I was the only one in

that cage" and that the word "banana would be in reference to [a] monkey or animal being locked in a cage. That's how I took it."

Brodie also interpreted Dorazo's act of locking him in a cage as being "racial" in nature. He did so because, unlike when Grasmick held defendant in the unlocked cage for seconds, Brodie "was physically locked in the cage" with a padlock for several minutes, with fellow employees laughing or mocking him while he was in there.

However, when Brodie was asked on direct examination why he believed Dorazo selected him to be locked in the cage, he testified:

Because Mike [Dorazo], when he asked me—Mike knew that I'm the type of person like I don't ask questions, like if work needs to be done, like I just do it and like I just, you know went with the flow. He—he asked me to give him a hand, or so I thought, in getting something, so I said, "Yeah, sure, where is it?" I walked up and that's when I was locked in the cage.

Asked on cross-examination whether his testimony meant that he thought Dorazo had selected him because Dorazo believed he was gullible, Brodie testified, "[y]ou could say that." Brodie further agreed that he was "both embarrassed and aggravated" that he had been "fooled . . . into being locked into th[e] cage."

No one in the building had a key to the padlock, so Dorazo directed Grasmick to retrieve the key from Moffa. Grasmick did so, but did not tell Moffa about the cage incident. Brodie testified that he was locked in the cage for some three to five minutes.

Upon his release from the cage, Brodie immediately left the building. He testified that he "couldn't believe what had just happened. I just needed to get away, because I was humiliated, embarrassed." According to Brodie, as he was walking toward the new Public Works Building, Dorazo came up to him and said, " '[y]ou all right, buddy? We were just joking around.' " [3] Brodie

---

[3] Brodie testified that another "joking around" activity practiced by Dorazo and other employees was "hot pockets," which involved putting a lit cigarette in a person's hood or jacket pocket while that person was unaware or distracted. Brodie did not consider "hot pockets" to be racially discriminatory because

responded, "'[y]eah, yeah, I'm fine,'" and "just left it at that." Brodie testified that he did not report the matter to Moffa or any other manager because he feared "retaliation" and because "no one ever gets written up, and things get swept under the rug."

At trial, two other eyewitnesses testified concerning the cage incident. Truck driver Brian Tronieri, who is Caucasian, observed Dorazo, who was standing at the top of the cage staircase, summon Brodie to help him get something from the cage for a supervisor. When Brodie entered the cage, Dorazo locked it and walked down the stairs laughing. Tronieri observed that Brodie "didn't look happy."

According to Tronieri, Dorazo selected Brodie as the person to lock in the cage because Dorazo "knew he would go up there." Tronieri testified that Dorazo "picked on like the weaker" employees, by which Tronieri meant "[w]eaker as in . . . they didn't know any better. They would just go up and do it."

Tronieri testified that defendant was not at the top of the stairs near the cage, but was "down at the bottom" when Brodie was locked in. Tronieri stated that, when Dorazo walked down the stairs, defendant remarked in a voice "[l]oud enough for everybody to hear it" that "'[y]ou can throw a banana in a cage and lock a monkey in there.'" Tronieri was in close proximity to defendant at that time and he was certain that Brodie heard defendant's remark.

The other testifying eyewitness to the cage incident was laborer William Dougherty. According to Dougherty, Dorazo told Brodie that Moffa wanted Brodie to help Dorazo get something out of the cage. When Brodie went up the stairs and entered the cage, Dorazo locked him in. Dougherty testified that it was Dorazo, not defendant, who lured Brodie into the cage and locked it. Brodie was "pretty upset" and tried to climb out of the cage.[4] Dougherty

---

"they did hot pockets to whoever. They didn't just single out black or white, it was just something that was done."

[4] In contrast, Brodie testified that he made no attempt to climb out of the cage.

yelled and cautioned Brodie not to climb out because it was unsafe to do so.

According to Dougherty, while Brodie was in the cage, defendant and Dorazo were standing together on the building's floor laughing; Dougherty remembered both men saying the word "monkey" and defendant saying the word "bananas." Specifically, Dougherty heard defendant remark, "he looks like a monkey in a cage, let's throw him some bananas."

Dougherty also testified about another remark made by defendant about seven months after the cage incident. In November or December 2007, defendant was operating a leaf-collection truck, assisted by Dougherty and another laborer, who was African–American. When the two laborers finished collecting leaf bags, Dougherty climbed onto the truck, but his co-worker was talking on a cell phone and did not get on the truck. In response, defendant drove off, leaving him behind. According to Dougherty, when he told defendant that they should go back to pick him up, defendant remarked, "[y]ou know, ... he's a lazy nigger. I don't know." After making that remark, defendant returned to the collection location and picked up the co-worker.

The cage incident was not reported to the police until January 2008. Following an investigation, on June 18, 2008, the police charged defendant with harassment by communication and harassment by alarming conduct, *N.J.S.A.* 2C:33–4a and –4c; official misconduct, *N.J.S.A.* 2C:30–2a; and bias intimidation, *N.J.S.A.* 2C:16–1a. Defendant was suspended without pay on June 23, 2008. He and Dorazo were indicted on February 18, 2009.[5]

## II

The bias intimidation statute (the statute) provides an enhanced penalty for the commission of certain predicate offenses, including

---

[5] The indictment also charged defendant and Dorazo with bias intimidation based on the predicate offense of false imprisonment, *N.J.S.A.* 2C:13–3. However, the jury acquitted defendant of false imprisonment.

harassment, *N.J.S.A.* 2C:33–4. Section a of the statute defines the elements of the crime:

> a. Bias Intimidation. A person is guilty of the crime of bias intimidation if he commits, attempts to commit, conspires with another to commit, or threatens the immediate commission of an offense specified in chapters 11 through 18 of Title 2C of the New Jersey Statutes; *N.J.S.[A.]* 2C:33–4; *N.J.S.[A.]* 2C:39–3; *N.J.S.[A.]* 2C:39–4 or *N.J.S.[A.]* 2C:39–5,
>
> (1) with a purpose to intimidate an individual or group of individuals because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity; or
>
> (2) knowing that the conduct constituting the offense would cause an individual or group of individuals to be intimidated because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity; or
>
> (3) under circumstances that caused any victim of the underlying offense to be intimidated and the victim, considering the manner in which the offense was committed, reasonably believed either that (a) the offense was committed with a purpose to intimidate the victim or any person or entity in whose welfare the victim is interested because of race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity, or (b) the victim or the victim's property was selected to be the target of the offense because of the victim's race, color, religion, gender, disability, sexual orientation, gender identity or expression, national origin, or ethnicity.
>
> [*N.J.S.A.* 2C:16–1a.]

Because defendant and the amicus Rutherford Institute urge that we find section 1a(3) unconstitutional, we begin by reviewing the applicable case law concerning the constitutionality of anti-bias crime laws. The cases are especially pertinent here, because they illustrate the constitutional pitfalls inherent in criminalizing speech and other expressive activity.

In *R.A.V. v. St. Paul,* 505 *U.S.* 377, 112 *S.Ct.* 2538, 120 *L.Ed.*2d 305 (1992), the United States Supreme Court held that a municipal ordinance prohibiting hate crimes violated the First Amendment. By its terms, the ordinance provided:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.
>
> [*Id.* at 380, 112 *S.Ct.* at 2541, 120 *L.Ed.*2d at 315 (citation and internal quotations omitted).]

The Court held that the ordinance impermissibly criminalized speech or other expressive activity based on its content and on the viewpoint of the speaker. *Id.* at 391–92, 112 *S.Ct.* at 2547–48, 120 *L.Ed.*2d at 323–24. The Court specifically rejected the argument that the ordinance could be justified because it was aimed at "fighting words" or their equivalent, expression traditionally excepted from First Amendment protection:

> What we have here, it must be emphasized, is not a prohibition of fighting words that are directed at certain persons or groups (which would be *facially* valid if it met the requirements of the Equal Protection Clause); but rather, a prohibition of fighting words that contain (as the Minnesota Supreme Court repeatedly emphasized) messages of "bias-motivated" hatred and in particular, as applied to this case, messages "based on virulent notions of racial supremacy." ... St. Paul's brief asserts that a general "fighting words" law would not meet the city's needs because only a content-specific measure can communicate to minority groups that the "group hatred" aspect of such speech "is not condoned by the majority." The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content.
>
> [*Id.* at 392, 112 *S.Ct.* at 2548, 120 *L.Ed.*2d at 323–24 (citations omitted).]

The Court further rejected an argument that the ordinance could be justified because it was aimed at the effect of the speech on the victim, rather than being solely aimed at its expressive content:

> St. Paul argues that the ordinance comes within another of the specific exceptions we mentioned, the one that allows content discrimination aimed only at the "secondary effects" of the speech, see *Renton v. Playtime Theatres, Inc.,* 475 *U.S.* 41, 106 *S.Ct.* 925, 89 *L.Ed.*2d 29 (1986). According to St. Paul, the ordinance is intended, "not to impact on [sic] the right of free expression of the accused," but rather to "protect against the victimization of a person or persons who are particularly vulnerable because of their membership in a group that historically has been discriminated against." ... [I]t is clear that the St. Paul ordinance is not directed to secondary effects within the meaning of *Renton* .... "Listeners' reactions to speech are not the type of 'secondary effects' we referred to in Renton." "The emotive impact of speech on its audience is not a 'secondary effect.'"
>
> [*Id.* at 394, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 325 (citations omitted).]

In *State v. Vawter,* 136 *N.J.* 56, 642 *A.*2d 349 (1994), our Supreme Court held that a very similar New Jersey statute prohibiting "hate crimes" violated the First Amendment, as previously construed in *R.A.V.* "Thus, Sections 10 and 11 fail for the same reason that the St. Paul ordinance failed: secondary effects

do not include listeners' reactions to speech or the emotive impact of speech." *Vawter, supra,* 136 *N.J.* at 75, 642 *A.*2d 349. In other words, the State cannot criminalize bigoted or "politically incorrect" speech based solely on a listener's offended reaction. As *Vawter* noted, the harassment statute requires proof of intent to harass, a feature we previously held saved the statute from First Amendment vulnerability. "In *State v. Finance American Corp.,* 182 *N.J.Super.* 33, 38 [440 *A.*2d 28 (App.Div.1981) ], the Appellate Division found that because *N.J.S.A.* 2C:33–4, the harassment statute, requires the speaker to have the specific intent to harass the listener, the statute regulates conduct." *Id.* at 67, 642 *A.*2d 349.

In construing another state statute prohibiting the commission of a crime if the commission "evidences prejudice based on the race . . . of the victim," the Florida Supreme Court reasoned that the statute would be constitutional only if it were construed to prohibit selection of the victim because of race, and not the mere expression of bias:

> First are those offenses committed because of prejudice. For instance, A beats B because B is a member of a particular racial group. This class of offense is virtually identical to the bias-motivated crimes proscribed by the valid Wisconsin statute in [*Wisconsin v.*] *Mitchell* [508 *U.S.* 476, 113 *S.Ct.* 2194, 124 *L.Ed.*2d 436 (1993) ]. The targeted activity—the selection of a victim—is an integral part of the underlying crime. As such, the conduct is not protected speech at all, but rather falls outside the First Amendment and may be banned.
>
> Second are those offenses committed for some reason other than prejudice but that nevertheless show bias in their commission. For example, A beats B because of jealousy, but in the course of the battery calls B a racially derogatory term. The targeted conduct here—the expression of bias—is related to the underlying crime in only the most tangential way: The expression and crime share the same temporal framework, nothing more. This tenuous nexus, which amounts to mere temporal coincidence, is irrelevant for constitutional purposes. The proscribed conduct consists of pure expression indistinguishable from the bias-inspired expression targeted by the St. Paul ordinance in *R.A.V.* and cannot be selectively banned.
>
> [*State v. Stalder,* 630 *So.*2d 1072, 1076 (Fla.1994).]

To save the statute from being unconstitutional, the court construed it to only prohibit bias-motivated crimes. *Id.* at 1077.

More recently, in *Virginia v. Black,* 538 *U.S.* 343, 123 *S.Ct.* 1536, 155 *L.Ed.*2d 535 (2003), the United States Supreme Court

held that Virginia could outlaw cross burning when performed for the purpose of intimidation. *Id.* at 363, 123 *S.Ct.* at 1549-50, 155 *L.Ed.*2d at 554. However, because cross burning was also a form of expression, the Court held unconstitutional a provision making the fact of burning a cross, without more, prima facie proof that the burning was done with the intent to intimidate. *Id.* at 364, 123 *S.Ct.* at 1550, 155 *L.Ed.*2d at 555. The Court reasoned that in creating the presumption, the law impermissibly burdened otherwise-protected expression. *Id.* at 364-67, 123 *S.Ct.* at 1550-52, 155 *L.Ed.*2d at 555-57.

### III

With those principles in mind, we turn to the anti-bias statute in question here. The law was passed in response to *Apprendi v. New Jersey*, 530 *U.S.* 466, 120 *S.Ct.* 2348, 147 *L.Ed.*2d 435 (2000), which held that a prior New Jersey "hate crime" statute violated due process in allowing a judge, rather than a jury, to impose an enhanced prison sentence based on a finding that the defendant committed the crime with a purpose to intimidate the victim because of the victim's race or membership in another protected class. The Supreme Court held that, as the statute was framed, intent to intimidate the victim because of race was an element of the crime and, therefore, must be found by a jury. *Id.* at 490, 120 *S.Ct.* at 2363, 147 *L.Ed.*2d at 455. The holding was based on the principle that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Id.* at 490, 120 *S.Ct.* at 2362-63, 147 *L.Ed.*2d at 455.

Following *Apprendi*, a bill sponsored by Senators Vitale and Gormley was introduced on November 13, 2000, providing that a defendant's alleged "purpose to intimidate" must be charged in the indictment, "treated as an element of the crime," and proven to the jury. The Statement on the bill indicated that it was a

response to *Apprendi*, and the language was tailored to directly address the concerns expressed in that decision:

> A prosecutor who plans to seek an extended term of imprisonment pursuant to *N.J.S.[A.]* 2C:43-7 for a defendant charged with a crime set forth in Title 2C of the New Jersey Statutes because the prosecutor alleges that the defendant acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity pursuant to subsection e. of *N.J.S.[A.]* 2C:44-3 in the commission of the crime shall charge this purpose in the indictment. The purpose to intimidate shall be treated as an element of the crime, and, as such, shall be submitted to the jury and proven beyond a reasonable doubt.
>
> [S. 1897, introduced November 13, 2000.]

However, this version was not enacted. Instead, a more complex substitute version, also sponsored by Senators Vitale and Gormley, and co-sponsored by Senator Baer, was introduced on December 10, 2000, and favorably reported by the Senate Judiciary Committee on December 14, 2000. With minor amendments not relevant here, that version, known as Senate Committee Substitute for Senate, No. 1897 (Senate Substitute), was eventually enacted on February 11, 2002. *L.* 2001, *c.* 443; *N.J.S.A.* 2C:16-1.

When introduced, the Senate Substitute already included section 1a(3), and that language was not amended before the statute was enacted. The legislative history contains no explanation for the inclusion of this section, which unlike sections 1a(1) and 1a(2), sets forth no specific scienter requirement.[6]

---

[6] In a case involving bias intimidation on the basis of disability, we explained the statute's mens rea requirement: "[T]o be guilty of bias intimidation, a defendant must know that the victim is [disabled] and must intentionally choose to victimize that person because of the person's [disability]." *State v. Dixon*, 396 *N.J.Super.* 329, 340, 933 A.2d 978 (App.Div.2007) (footnote omitted); *see L.* 2007, *c.* 303 (replacing the term "handicap" with "disability"). However, Dixon was not convicted of committing a crime perceived by the victim as motivated by bias, under section 1a(3) of the statute. Rather, she was convicted of violating section 1a(1), based on evidence that she intentionally chose to rob the victim because of his disability. Therefore, *Dixon* does not answer the questions posed in this case.

The only available legislative history for the Senate Substitute is the December 14, 2000 Senate Judiciary Committee Statement to Senate Committee Substitute [SCS] for Senate, No. 1897, and the May 7, 2001 Assembly Judiciary Committee Statement to SCS for Senate, No. 1897. Both Statements contain the same language, indicating that the substitute bill "is in response to" *Apprendi* and explicitly referencing the intent requirement. We quote the relevant portion of the Senate Statement in its entirety:

> This substitute is in response to the United States Supreme Court ruling in *Apprendi v. New Jersey*, 530 *U.S.* [466], 120 *S.Ct.* 2348 [147 *L.Ed.*2d 435] (decided June 26, 2000) which held unconstitutional subsection e. of *N.J.S.[A.]* 2C:44–3 which authorizes the imposition of an extended term of imprisonment upon a finding by the sentencing court that the defendant committed a crime with a purpose to intimidate the victim because of the victim's race, color, gender, handicap, religion, sexual orientation or ethnicity. In *Apprendi*, the Supreme Court held that any fact which increases the penalty of a crime beyond the statutory maximum, other than the fact of a prior conviction, must be submitted to the jury and proved beyond a reasonable doubt.
>
> SCS for S–1897 seeks to preserve the purpose of the New Jersey bias crime statute by establishing the separate crime of bias intimidation which must be charged and proved as any other crime. *A person would be guilty of bias intimidation if the person commits any crime listed in the bill with a purpose to intimidate an individual or group of individuals because of race,* color, religion, gender, handicap sexual orientation or ethnicity.
>
> [Senate Judiciary Committee Statement to Senate Committee Substitute for S. 1897 (emphasis added).]

Clearly, both houses of the Legislature understood that the bill they were considering required proof that the defendant committed the underlying crime "with a purpose to intimidate" the victim because of race or membership in another protected class, i.e., that the bill required proof of the defendant's intent to commit a bias crime.

We also note that, at the time *Apprendi* was decided, there were already specific statutes in place prohibiting harassment or simple assault "with a purpose to intimidate [the victim] because of race." *N.J.S.A.* 2C:33–4d; *N.J.S.A.* 2C:12–1e. Both of those statutes were deleted by the Senate Substitute, apparently because the Legislature recognized that they would be subsumed within the newly-enacted *N.J.S.A.* 2C:16–1.

In construing *N.J.S.A.* 2C:16–1a(3), we also consider the gap-filler statute, *N.J.S.A.* 2C:2–2, which states a clear presumption against strict liability criminal offenses. "A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as" requiring the State to prove that the defendant committed the crime "knowingly." *N.J.S.A.* 2C:2–2c(3), –2b(2); *see also State v. Chiarello*, 69 *N.J.Super.* 479, 494, 174 *A.2d* 506 (App.Div.1961) (the enactment of strict liability criminal statutes should be " 'sharply limited' " (citation omitted)), *certif. denied*, 36 *N.J.* 301, 177 *A.2d* 343 (1962).

We will construe a statute according to the Legislature's expressed purpose, *State v. Shelley*, 205 *N.J.* 320, 323, 15 *A.3d* 818 (2011), and wherever possible, we will avoid a construction that would require us to declare the statute unconstitutional. *See State v. Mortimer*, 135 *N.J.* 517, 533–34, 641 *A.2d* 257 (1994). Further, under the "doctrine of lenity," where ambiguities in a criminal statute cannot be resolved by consulting the text or the legislative history, the statute is to be construed "in favor of the defendant." *Shelley, supra*, 205 *N.J.* at 324, 15 *A.3d* 818.

Following those bedrock principles, we reject the State's argument that *N.J.S.A.* 2C:16–1a(3) imposes criminal liability based solely on the victim's perception of the underlying crime, regardless of the defendant's intent. Rather, based on the legislative history, we infer that *N.J.S.A.* 2C:16–1 requires proof of intent with respect to each element of the offenses defined in subsection 1a(3).[7] That is, the defendant must intend to commit the predicate offense, and must also intend to intimidate the victim because of his or her membership in a protected class and intend to cause the victim to perceive the underlying offense as being bias-motivated. In reaching that conclusion, we also consider that to construe subsection (3) otherwise would cause the statute to run

---

[7] The State's reliance on *State v. Gandhi*, 201 *N.J.* 161, 989 *A.2d* 256 (2010), is misplaced. That case construed the anti-stalking statute, *N.J.S.A.* 2C:12–10, which has a vastly different legislative history from the bias intimidation statute.

afoul of the First Amendment principles espoused in *Black*, *R.A.V.*, and *Vawter*.[8]

### IV

We next address defendant's convictions for harassment, *N.J.S.A.* 2C:33–4a and –4c, and his resulting convictions for bias intimidation. In pertinent part, the harassment statute provides:

[A] person commits a petty disorderly persons offense if, *with purpose to harass another*, he:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm; [or]

. . . .

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[*Ibid.* (emphasis added).]

In upholding *N.J.S.A.* 2C:33–4a against a vagueness challenge, our Supreme Court emphasized that a conviction under that section requires that the defendant act purposefully:

[W]e conclude that subsection a is not vague. As this Court has noted, "The meaning ascribed to words used in a statute may be indicated or controlled by the words with which it is associated." Thus, the requirement, applying to all of section 4, that a defendant act "with purpose to harass another" serves to clarify the otherwise—vague phrases of subsection a. "With purpose to harass another" imposes a specific-intent requirement on subsection a, thereby clarifying the conduct that subsection a proscribes. Accordingly, a person is indictable under subsection a only if that person makes a communication (or communications) using one of the enumerated methods and that person specifically intends thereby to harass the intended recipient of the communication.

[*Mortimer, supra*, 135 *N.J.* at 536, 641 *A.2d* 257 (citation omitted).]

■ The harassment charges were based on allegations that defendant participated in locking the victim in the cage (harass-

---

[8] Subsection (3), as we construe it, could apply to "piggyback" or opportunistic bias crimes, as in the following example: one defendant knocks the victim down, intending only to demonstrate his dominance in the neighborhood, but a co-defendant, who wishes to drive members of the victim's ethnic group out of the neighborhood, mocks the fallen victim with ethnic slurs intended not only to harass and intimidate the victim but to convince him that the entire incident was bias-related.

ment by alarming conduct) and that defendant made a coarse and offensive statement about the victim while he was locked in the cage (harassment by communication). Viewed in the light most favorable to the State, *State v. D.A.*, 191 *N.J.* 158, 163, 923 *A.*2d 217 (2007), the evidence would support the following factual findings. On April 4, 2007, Dorazo lured the victim into a cage suspended many feet above the floor and locked him in. The victim could not get out without risking severe injury. He was understandably upset at his helpless and frustrating situation. Instead of offering to assist the victim to escape, or leaving to seeking help, defendant directed a crude and offensive insult at the victim with the intent to further annoy and upset him, i.e., to harass him. *See J.D. v. M.D.F.*, 207 *N.J.* 458, 477, 25 *A.*3d 1045 (2011) (harassment by communication "begins with a communication that has been made ... in coarse or offensive language ..."). Given these unusual circumstances, including the victim's precarious, helpless, and otherwise distressing situation at the time, we conclude that defendant's purposeful conduct satisfied the statutory definition of harassment by communication, *N.J.S.A.* 2C:33–4a.[9]

■ The evidence could also support a finding that although neither Dorazo nor defendant knowingly committed the crime of false imprisonment, they both intended to commit a stupid prank that would involve briefly locking Brodie in the cage, much the way Grasmick had earlier attempted to lock defendant in the cage.[10] If the jury determined that defendant acted as Dorazo's

---

[9] "[A]s some courts and commentators have suggested, speech may be more readily subject to restrictions when a school or workplace audience is 'captive' and cannot avoid the objectionable speech." *Saxe v. State Coll. Area Sch. Dist.*, 240 *F.*3d 200, 210 (3d Cir.2001). In this case, the victim was the quintessential "captive" audience.

[10] False imprisonment requires, among other things, that a defendant "knowingly" restrains the victim in a manner that interferes "substantially" with the victim's liberty. *N.J.S.A.* 2C:13–3. A jury could conclude that locking Brodie in the cage for a few minutes was not a substantial interference with his liberty.

accomplice, the jury could also have found defendant guilty of harassment by alarming conduct, *N.J.S.A.* 2C:33–4c. *State v. J.T.*, 294 *N.J.Super.* 540, 545, 683 *A.*2d 1166 (App.Div.1996) (for purposes of *N.J.S.A.* 2C:33–4c, one alarming incident may constitute a course of conduct); *see also J.D., supra,* 207 *N.J.* at 478, 25 *A.*3d 1045.

However, having determined that defendant harassed the victim by communication and by alarming conduct, the jury also found that defendant did not do so either with the purpose to intimidate the victim because of his race or knowing that the harassing conduct would cause the victim to be intimidated because of race.

 Instead, the jury convicted defendant under subsection (3): that defendant harassed the victim under circumstances that caused him to be intimidated and caused him to reasonably believe that the harassment was committed with a purpose to intimidate him because of race; or that in light of the way the harassment was committed, the victim reasonably believed he was selected to be the target because of his race. *N.J.S.A.* 2C:16–1a(3)(a), – 1a(3)(b). The judge specifically charged the jury that defendant's guilt under subsection (3) did not turn on his intent in committing the predicate offense, but on the victim's reaction to the crime. Consequently, the jury could have convicted defendant upon finding that: (a) defendant made a crude, insulting comment, without racially-biased intent but with the intent to upset and annoy the victim, however, (b) the victim reasonably interpreted defendant's comment as a racial insult and, because of that insult, concluded that he had been targeted for the entire incident because of his race. Such a finding would be insufficient to prove a violation of subsection (3), as we have construed it.

Because the court did not charge the jury that the State was required to prove defendant's bias-motivated purpose in committing the crime, defendant's conviction under *N.J.S.A.* 2C:16–1a(3) must be reversed.

## V

■ Since defendant's conviction for misconduct in office, *N.J.S.A.* 2C:30–2a, was based on the bias crime conviction, we must also reverse his conviction for misconduct in office.[11] We next address defendant's argument that even if he committed bias-motivated harassment, the trial evidence was insufficient to support a conviction for misconduct in office and, hence, he cannot be re-tried for that offense.

The crime of misconduct in office is defined, in relevant part, as follows:

A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:

a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; . . . .

[*Ibid.*]

■ "The statute's purpose plainly is to prevent the perversion of governmental authority." *State v. Perez*, 185 *N.J.* 204, 206, 883 *A.*2d 367 (2005). However, the mere fact that a public employee commits a crime while at work does not automatically make the employee guilty of misconduct in office. "[N]ot every offense committed by a public official involves official misconduct." *State v. Hinds*, 143 *N.J.* 540, 549, 674 *A.*2d 161 (1996) (citing *Craig v. Texas*, 31 *Tex.Crim.* 29, 19 *S.W.* 504 (Tex.Crim.App.1892), which held that drunkenness in office did not involve official misconduct).

The essential questions are whether the act related to a public office and whether the actors knew that the act was unauthorized. The crime is not proven by showing misconduct committed by a person who happens to be a public officer; that is, the misconduct must be connected to that person's official duties.

. . . .

[T]he public servant must know of the existence of the duty which he is accused of violating. The duty to act must be so clear that the public servant is on notice as to the standards he must meet.

---

11 During the trial, the State specifically agreed that the official misconduct charge was based on defendant having committed bias intimidation, and the verdict sheet reflects that agreement.

[*State v. Schenkolewski,* 301 *N.J.Super.* 115, 144, 146, 693 *A.*2d 1173 (App.Div.), *certif. denied,* 151 *N.J.* 77, 697 *A.*2d 549 (1997).]

We conclude that the validity of a conviction for misconduct in office would hinge on the specific acts that the jury found defendant committed.

In arguing that defendant committed misconduct in office, the State relies on the fact that Brodie was lured into the cage, which was public property, and the fact that Dorazo told Brodie that a supervisor had directed that they retrieve equipment from the cage. If defendant acted as Dorazo's accomplice, those facts would support a conviction for official misconduct. However, if defendant had no involvement in luring Brodie into the cage, and merely played the role of an obnoxious bystander, his act of harassment by communication would not support a conviction for official misconduct.

 Assuming hypothetically that defendant harassed the victim by communication, with biased intent, he committed criminal conduct. He also almost certainly committed the administrative offense of conduct unbecoming a public employee. But every act of workplace misconduct by a public employee does not necessarily translate into the crime of misconduct in office. In this scenario, whether or not defendant acted with a biased motivation, he was not committing "an unauthorized exercise of his official functions." *N.J.S.A.* 2C:30–2a. Making the comment was not related to his official duties. *See State v. Kueny,* 411 *N.J.Super.* 392, 407, 986 *A.*2d 703 (App.Div.2010). He did not have a supervisory role over the victim. He did not use his employer's equipment to commit the crime or invoke a supervisor's authority to lure Brodie into the cage. Although we in no way condone bias-motivated harassment by communication, the language of the misconduct in office statute simply cannot be stretched to cover the actions of a mere bystander who made a harassing comment to a fellow employee.

Accordingly, defendant cannot be retried for misconduct in office based on the predicate offense of bias-motivated harassment

by communication. He can, however, be re-tried for misconduct in office based solely on the theory that he committed bias-motivated harassment by alarming conduct, by acting as Dorazo's accomplice in locking Brodie in the cage.

## VI

Defendant's remaining appellate arguments are without sufficient merit to warrant discussion, beyond the following brief comments. *R.* 2:11–3(e)(2). Defendant contends that his employer pursued the criminal complaint in retaliation for his earlier filing of a discrimination complaint against the Public Works Department. On that basis, he claims the indictment was the result of selective prosecution. The record does raise some unanswered questions about the timing of the employer's investigation into this incident. However, defendant produced no evidence that the prosecutor's office engaged in selective prosecution. *See State v. Di Frisco*, 118 *N.J.* 253, 266, 571 *A.*2d 914 (1990). Nor are we persuaded that the judge abused his discretion in denying defendant's speedy trial motion, or in declining to dismiss a juror who had a passing acquaintance with the victim's brother. *See State v. R.D.*, 169 *N.J.* 551, 559–60, 781 *A.*2d 37 (2001). The judge conducted a thorough voir dire of the juror before determining that she could be fair and impartial. The brother was on the State's witness list but did not testify at the trial.

We find no error in the judge's decision to preclude defendant from admitting evidence concerning his previous employment-related grievances. *See N.J.R.E.* 403. Nor did the judge abuse his discretion in admitting evidence about the "whipping" incident and about defendant's use of a racial slur on another occasion. That evidence was relevant to defendant's motive concerning the cage incident, *N.J.R.E.* 404(b), and the judge gave the jury a lengthy and detailed limiting instruction concerning the evidence. *See Mortimer, supra,* 135 *N.J.* at 538, 641 *A.*2d 257.

## VII

To summarize, we affirm defendant's convictions for harassment by communication, *N.J.S.A.* 2C:33–4a, and harassment by alarming conduct, *N.J.S.A.* 2C:33–4c. We reverse the convictions for bias intimidation, *N.J.S.A.* 2C:16–1a(3), and misconduct in office, *N.J.S.A.* 2C:30–2a, and we remand for re-trial on those counts only. The judgment of conviction (JOC) must be amended to reflect our decision, as well as to reflect the result of any re-trial.[12]

The parties have not briefed the issue of whether, given the overlap among the various sections of the bias intimidation statute, double jeopardy principles would preclude a re-trial. *See Yeager v. United States*, 557 *U.S.* 110, 120, 129 *S.Ct.* 2360, 2367, 174 *L.Ed.*2d 78, 88 (2009). On remand, defendant may raise the issue by motion in the trial court. We intimate no view as to the outcome of such a motion.

Affirmed in part, reversed and remanded in part.

---

[12] The trial court sentenced defendant to probation conditioned on serving 270 days in jail, with that sentence to be served on weekends. The aggregate sentence included a concurrent term of thirty days for harassment. Defendant did not appeal from the sentence. Therefore, if the State chooses not to re-try him, the JOC shall be amended to reflect solely the harassment convictions and to reflect a sentence of thirty days in jail to be served on weekends.